**Keith THOMAS and Ron Herndon, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 05–CF–299, 05–CF–322.**

District of Columbia Court of Appeals.

Argued Feb. 11, 2009.

Decided Aug. 27, 2009.

Patrick T. Hand, Washington, appointed by the court, for appellant Thomas.

Mindy A. Daniels, appointed by the court, for appellant Herndon.

Katherine M. Kelly, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Daniel S. Friedman, and David P. Saybolt, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, GLICKMAN, Associate Judge, and STEADMAN, Senior Judge.

GLICKMAN, Associate Judge:

Appellants Keith Thomas and Ron Herndon were tried jointly before a jury. Each was convicted of first-degree premeditated murder while armed and possession of a firearm during a crime of violence. The government's proof at trial included four out-of-court statements that Thomas or Herndon had made to a relative or other acquaintance. To a greater or lesser degree, each of these statements inculpated not only its maker but also his co-defendant at trial. Two of the statements were admitted against both defendants on the trial court's determination that they qualified under the hearsay exception for declarations against penal interest (in addition to being admissions of a party-opponent). The other two state-

ments were admitted only against their maker, in one case with redactions to exclude incriminating references to the co-defendant. The principal issue in these consolidated appeals is whether the admission of these four statements violated appellants' rights under either the Confrontation Clause of the Sixth Amendment as interpreted by the Supreme Court in *Bruton v. United States*[1] and *Crawford v. Washington*[2]—inasmuch as Thomas and Herndon did not testify and hence could not cross-examine each other about the statements—or Criminal Rule 14[3] as construed by this Court in *Carpenter v. United States.*[4]

We hold that the introduction of appellants' statements in their joint trial did not infringe either appellant's rights under the Confrontation Clause because the statements were not testimonial within the meaning of *Crawford.* Moreover, with qualifications that do not affect the outcome, we uphold the trial court's rulings on the admissibility of the statements. And although appellants raise several other claims of error, we find none warranting reversal and so affirm their convictions.

## I. The Evidence at Appellants' Trial

Appellants were prosecuted for the murder of James Fisher. Early in the morning on July 31, 2002, Fisher was sitting in the Temple Court area of the Sursum Corda housing project in Northwest D.C. when two men approached him from behind and one of them shot him three times in the back with a 9 millimeter semiautomatic handgun. The government's theory at trial was that the two men were Thomas and Herndon and that they killed Fisher in a bungled act of revenge, having mistaken him for another Sursum Corda resident named "Frank" who reputedly had shot to death their friend "Slush" (Marvin Gross) four days earlier. According to witnesses who knew the two men, Fisher and "Frank" both wore their hair in dreadlocks and closely resembled each other from behind. (The day after Fisher's death, "Frank" reportedly shaved his head.)

The government relied on a mosaic of evidence to tie Thomas and Herndon to Fisher's slaying. Sarah Margaret Davis, a resident of Sursum Corda, saw two young men leave her neighbor Angela Freeman's porch and walk toward Fisher, who was sitting nearby. One of the men was carrying a gun. As Davis then knocked on her friend Kineka Fowler's door to ask her to summon the police, she heard gunshots. Davis did not identify either man at trial, but Fowler testified that Davis told her it was "Little Man [who] killed Fisher."[5] "Little Man" was appellant Herndon's nickname, and Angela Freeman is his half-sister.

Freeman, who was a reluctant prosecution witness, testified that Herndon was "kind of upset" that Slush had been killed. Before Fisher was murdered, Herndon repeatedly asked Freeman to tell him "who was Frank and how he look." Four days

1. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

2. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

3. Super. Ct.Crim. R. 14.

4. 430 A.2d 496 (D.C.1981) (en banc).

5. Although Davis denied having told Fowler who killed Fisher, her statement to Fowler came in, without objection, as substantive evidence under the hearsay exception for prior identifications. *See* D.C.Code § 14–102(b)(3) (2001) ("A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is ... (3) an identification of a person made after perceiving the person. Such prior statements are substantive evidence.").

after Fisher's shooting, Herndon showed Freeman a handgun, "the kind you put a clip in." The government's firearms expert testified that a "clip" signified a semiautomatic or fully automatic weapon, which was consistent with the cartridge casings found at the scene of the crime. Herndon subsequently convinced Leona Bradford, his then-girlfriend, to supply him with a false alibi for the morning of Fisher's murder. Bradford related this alibi to the grand jury but recanted it at trial. And while Herndon was in pretrial custody, he told a fellow prisoner named Gregory Bell that he "love[d] Slush and we had to do what we had to do," and that he was "in the middle of what was done." Herndon also told Bell that he himself "did not do the shooting and that someone else had shot the guy in the back." [6]

 In addition to the preceding evidence, the government relied on the four out-of-court statements by appellants that are at issue in the instant appeals. Herndon made the first: in a private conversation with Freeman, Herndon told her that he and Thomas left her porch, "went up behind the guy with the dreadlocks," and "I [Herndon] killed him, Keith's [Thomas's] gun jammed." Herndon's statement to Freeman thus identified Thomas as his accomplice in Fisher's murder. Freeman reported her brother's statement to Detective Jeffrey Williams and the grand jury. The trial court ruled the statement admissible against Thomas under the hearsay exception for declarations against penal interest. (The statement was admissible

against Herndon himself, of course, as an admission by a party-opponent.[7]) In her testimony at trial, Freeman disavowed her account of Herndon's admission of guilt, claiming she told "a story" because she felt threatened in the neighborhood after the shooting, needed government funds to help her relocate to a different area, and was "pressured" by the police. Freeman's recantation was impeached by her grand jury testimony and by Detective Williams. Her sworn grand jury testimony was admitted as substantive evidence of Herndon's incriminating statement.[8]

The second statement was made by Thomas to his brother's girlfriend, Jimi Stover. "[A] couple of days" after Slush was killed, Stover saw Thomas retrieve a black revolver from a linen closet in her home, at which time he told her "that him and Ron was going to finish that shit with Slush." Thomas's statement thus implicated Herndon in the plan to retaliate against Slush's killer. Stover related the statement to the grand jury and again during a pretrial voir dire examination, which was held to enable the trial court to determine whether Thomas's statement was sufficiently reliable to be admissible against Herndon as a declaration against penal interest. The trial court determined that it was. At trial, however, Stover claimed to have lied in her previous testimony because she had been "threatened" by a police officer investigating Fisher's death. She claimed the officer had "spoon fed" her the contents of her testimony and "harassed [her] and threatened [her] for two

---

6. Thomas does not claim the court erred in admitting Herndon's statements to Bell, though they are similar to one of the statements discussed below, which Thomas made to the same witness.

7. *See Comford v. United States,* 947 A.2d 1181, 1185 (D.C.2008); *Chaabi v. United States,* 544 A.2d 1247, 1248 (D.C.1988).

8. *See* D.C.Code § 14–102(b)(1) ("A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (1) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition.... Such prior statements are substantive evidence.").

whole years." She was duly impeached with her grand jury and voir dire testimony (which, like Freeman's prior testimony, was admitted as substantive evidence under D.C.Code § 14–102(b)(1)).

Thomas made the third statement to Gregory Bell. Bell testified that in November 2002, he was hanging out with a group of people in Barry Farms when Thomas arrived and joined them. The group's conversation turned to Slush and how he was missed. According to Bell, Thomas then said, "We handled that." This statement indicated that Thomas had an (unidentified) accomplice in the murder of Fisher. The government sought to introduce the statement only against Thomas (as an admission of a party-opponent), and the trial court ruled that no redaction of the statement was necessary to protect Herndon's rights. Thereafter, before the jury, Bell testified that Thomas had said, "that, you know, they handled that and wasn't no [sic]." Although Bell thus changed the plural pronoun from "we" to "they" in relating what Thomas had said, he did not identify any other persons to whom the pronoun referred.[9]

The last statement at issue is one Thomas made to Danny Winston. In April 2003, Winston was on trial for murder. (He eventually was convicted.) During a break, he was taken to a holding cell behind the courtroom. There, he encountered Thomas, who had been brought to court for a pretrial hearing in the instant case. Thomas struck up a conversation, asking Winston "what [he] was dressed up for," and Winston replied that he was charged with aiding and abetting second-degree murder. Thomas said his own charge was similar. According to Winston, Thomas then told him (in the unredacted version of their conversation) that he and Herndon had approached "a guy with dreads, sitting with his back to them.... Ron ran up and shot him a couple times in the back. When Ron did this, Ron did not do this alone; Keith was with him. Keith did not have a gun." Because this statement shifted the blame for Fisher's murder from Thomas to Herndon, the trial court ruled that it was not admissible as a declaration against penal interest and would have to be redacted to eliminate the references to Herndon. In the sanitized version that the jury heard, Thomas told Winston he was "with someone" on "a friend's relative['s] porch" when "[t]hey saw the person they was beefing with," who was wearing dreadlocks and sitting with his back to them. Thomas "left the porch" and "[came] out from behind" the person, who then "got killed." Winston was allowed to relate that Thomas also said that he was not the shooter, and that the "the wrong person" was killed due to "mistaken identity."

As neither Thomas nor Herndon testified, neither defendant was subject to cross-examination by the other regarding his purported statements.[10] After Bell testified, the trial court instructed the jury that when it considered the statements about which he had testified, "each of those bits of evidence are admitted solely as evidence against the particular defendant who was alleged to have made those statements." Similarly, the court told the jury after Winston testified, "that evidence is admitted solely as evidence against Mr. Thomas who is alleged to have made that statement, not against the other defendant." The trial court repeated similar

---

**9.** Bell did not recall anything else Thomas said, and the government impeached him with his grand jury testimony, in which he related a statement by Thomas that "the guy that—that got killed, he wasn't the one."

**10.** Herndon did not present any evidence, while Thomas called two witnesses in support of an alibi defense.

instructions in its closing charge to the jury. The court gave no limiting instruction with respect to the statements to Freeman and Stover that were admitted under the penal interest exception.

## II. Appellants' Challenges Under *Bruton* and *Carpenter* to the Admission of Each Other's Statements in Their Joint Trial

█ Thomas argues that the trial court should have redacted Herndon's statement to Freeman to protect his rights under the Confrontation Clause of the Sixth Amendment and Criminal Rule 14, as required by *Bruton* and *Carpenter* respectively. On the same grounds, Herndon argues that the trial court erred by failing to redact Thomas's remarks to Stover and Bell and by insufficiently redacting Thomas's statements to Winston. Alternatively, Herndon argues, in the absence of such remedial measures or the exclusion of Thomas's statements altogether, the trial court abused its discretion by denying his motion to sever his case from Thomas's.[11] To evaluate these contentions, we first must consider the requirements of *Bruton* and *Carpenter* in light of the Supreme Court's recent construction of the Confrontation Clause.

## A. The Requirements of *Bruton* and *Carpenter*

A defendant's confession or other extrajudicial statement may be inadmissible against a co-defendant under the Confrontation Clause or traditional rules of hearsay. When the government seeks to introduce such a statement against its maker in a joint trial before a jury, *Bruton* and *Carpenter* afford protections to the nondeclarant co-defendant. The source and scope of the protections mandated by the two cases differ.

In *Bruton*, the government introduced the confession of Bruton's co-defendant Evans at their joint trial for armed robbery. The confession, which concededly was inadmissible against Bruton,[12] directly inculpated him by name as Evans's confederate in the robbery. Because Evans did not take the stand at trial, Bruton was unable to cross-examine him about the confession. The trial court instructed the jury that, although the confession was competent evidence against its maker, it was inadmissible hearsay against Bruton and therefore had to be disregarded in determining Bruton's guilt or innocence.

Concluding that it is unrealistic to expect lay jurors in a joint trial to consider a "powerfully incriminating" extrajudicial statement against its maker but not against an explicitly named and inculpated co-defendant,[13] the Supreme Court re-

---

11. Herndon also claims that his case should have been severed because he and Thomas presented antagonistic defenses at trial. *See Roy v. United States*, 871 A.2d 498, 503 (D.C. 2005). The claim is factually incorrect, however. The theory of each appellant's defense was misidentification. The defenses were not in conflict.

12. The Supreme Court took pains to "emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence.... There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation

Clause." 391 U.S. at 128 n. 3, 88 S.Ct. 1620. In *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court embraced the proposition that hearsay evidence with adequate "indicia of reliability"—evidence falling within "a firmly rooted hearsay exception" or with "particularized guarantees of trustworthiness"—is exempt from the defendant's constitutional right to confront the unavailable declarant. *Crawford*, of course, overruled *Roberts*, as we discuss below.

13. The Court explained that, while "there are many circumstances" in which the jury reasonably can be expected to follow instructions to disregard inadmissible hearsay or other evidence,

versed Bruton's conviction on constitutional grounds. It held that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated [Bruton's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." [14]

One way to avoid the constitutional problem while retaining the benefits of a joint trial, the *Bruton* Court suggested, might be to redact the incriminating references to a co-defendant in the declarant defendant's extrajudicial statement—a solution the Court later approved explicitly.[15] Alternatively, unless the prosecution were to choose to forego introducing the extrajudicial statement against its maker in its case-in-chief, the inculpated co-defendant would be entitled to a separate trial.

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.
>
> 391 U.S. at 135–36, 88 S.Ct. 1620 (citations omitted).

14. *Id.* at 126, 88 S.Ct. 1620; *see also id.* at 137, 88 S.Ct. 1620 ("[W]e cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination.").

15. See *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), which we discuss below.

16. *See Nelson v. O'Neil*, 402 U.S. 622, 626–27, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); *see also Crawford*, 541 U.S. at 59 n. 9, 124 S.Ct. 1354.

▮▮▮ Admission of an unredacted statement in a joint trial poses no problem under the Confrontation Clause if the declarant defendant testifies and is subject to cross-examination by the co-defendant.[16] However, "the opportunity to cross-examine does not operate to make [an otherwise inadmissible] incriminating extrajudicial statement admissible against the nondeclarant codefendant." [17] Consequently, we concluded in *Carpenter*, "satisfaction of a defendant's Sixth Amendment right to confrontation under the *Bruton–Nelson* standard does not terminate the trial judge's continuing duty to take adequate steps to reduce or eliminate any prejudice arising from joinder" [18]—a duty imposed on the trial judge by Criminal Rule 14.[19] Specifically, we held, "Rule 14 requires that the trial court take appropriate steps to minimize the prejudice inherent in codefendant confessions which are inadmissible against the nondeclarant defendant" [20] even when

17. *Carpenter*, 430 A.2d at 503.

18. *Id.*

19. The Rule, entitled "Relief from prejudicial joinder," provides as follows:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the Court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the Court may order the prosecutor to deliver to the Court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.
> Super. Ct.Crim. R. 14.

20. *Carpenter*, 430 A.2d at 502; *see also Brisbon v. United States*, 957 A.2d 931, 954 (D.C. 2008) ("*Carpenter* sets out what must be done in a jury trial when one defendant's extrajudicial statement inculpates a codefendant and is not admissible against the latter under a hear-

the declarant is available for cross-examination. Because *Bruton's* logic "applies with equal force" in such situations,[21] the remedial options under Rule 14 when one defendant's extrajudicial statement directly inculpates a co-defendant are the same as under the Confrontation Clause: "unless the government agrees to 'forego any use of the statement,' it must be redacted to eliminate all incriminating references to the co-defendant, or the co-defendant's motion for severance must be granted— 'whether or not' the defendant who made the statement takes the stand and testifies." [22] A limiting instruction alone is not a sufficient prophylaxis.

The protective measures mandated by *Bruton* are not constitutionally required if admission of the co-defendant's out-of-court statement against the non-declarant defendant would not violate the Confrontation Clause. Similarly, if such a statement falls within an exception to the hearsay rule, the requirements of *Carpenter* do not apply. In 2004 and 2006, with its decisions in *Crawford* and *Davis v. Washington,*[23] the Supreme Court changed the test for whether an extrajudicial statement is subject to exclusion under the Confrontation Clause. Under those cases, the issue turns on whether the statement is "testimonial" (a term of art, the meaning of which we discuss below). *Crawford* held that the Confrontation Clause bars the government from introducing a testimonial statement at trial against a criminal defendant to prove the truth of the matter asserted therein—unless the government calls the declarant to testify in person or the declarant is unavailable and the defendant had a prior opportunity to cross-examine him—regardless of how reliable the statement is perceived to be or whether it fits within a recognized hearsay exception.[24] *Davis* held that *only* testimonial statements are covered by this bar; if a hearsay statement is not testimonial in nature, the Confrontation Clause does not operate as a barrier to its admission.[25]

The implications of *Crawford* and *Davis* for the *Bruton* doctrine are twofold. First, if a defendant's extrajudicial statement inculpating a co-defendant *is* testimonial, *Bruton* requires that it be redacted for use in a joint trial to protect the co-defendant's Sixth Amendment rights even if the unredacted statement would be admissible against the co-defendant under a hearsay exception. Second, if a defendant's extrajudicial statement inculpating a

---

say exception." (internal quotation marks omitted)).

**21.** *Carpenter,* 430 A.2d at 502.

**22.** *Geter v. United States,* 929 A.2d 428, 431 (D.C.2007) (quoting *Carpenter,* 430 A.2d at 504). "Only 'in a certain, limited class of cases,' where 'redaction is impracticable' and the references to the co-defendant 'are not significantly incriminating,' may it be 'appropriate for the trial court, after weighing the alternatives, and recognizing the desirability of excluding inadmissible evidence, to admit the statement with limiting instructions.' " *Id.* at 431–32 n. 7 (quoting *Carpenter,* 430 A.2d at 505).

**23.** 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

**24.** *See Crawford,* 541 U.S. at 63–65, 124 S.Ct. 1354. There may be an exception for dying declarations, *see id.* at 55 n. 6, 124 S.Ct. 1354, and the defendant may waive Sixth Amendment rights by intentionally procuring the absence of the witness from trial (for example, by killing the witness specifically in order to prevent him from testifying), *see Giles v. California,* —— U.S. ——, ——, 128 S.Ct. 2678, 2693, 171 L.Ed.2d 488 (June 25, 2008).

**25.** As the *Davis* Court explained, only "testimonial" statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." 547 U.S. at 821, 126 S.Ct. 2266 (citation omitted).

co-defendant is *not* testimonial, *Bruton* does not apply, because admission of the uncensored statement in evidence at a joint trial would not infringe the co-defendant's Sixth Amendment rights, whether or not the statement fits within a hearsay exception.[26] On the other hand, *Crawford* and *Davis* have no comparable impact on the requirements of *Carpenter.* Whether or not it is testimonial, a defendant's extrajudicial statement directly implicating a co-defendant is equally susceptible to improper use by the jury against that co-defendant. A defendant's non-testimonial out-of-court statement therefore remains a candidate for redaction (or other remedial measures) under Criminal Rule 14 unless it fits within a hearsay exception rendering it admissible against the non-declarant co-defendant.

■ Accordingly, in our discussion of the four statements at issue in this appeal, we shall proceed as follows. We first determine whether the trial court properly held that none of the remarks at issue on appeal was testimonial in nature. We review that conclusion of law de novo,[27] and we hold that it was correct. Admission of the extrajudicial statements therefore jeopardized neither appellant's Sixth Amendment rights, and *Bruton's* requirements are moot.

■ Next, we examine the trial court's ruling that two of the statements qualified as declarations against penal interest; if so, *Carpenter's* restrictions did not apply to them and they properly were admitted without redaction against the non-declarant defendants. "The trial court's conclusion that a statement is against the declarant's penal interest is clearly a legal question," as to which our review is de novo.[28] However, we will not disturb the factual findings supporting the court's conclusion unless they are clearly erroneous.[29] We hold that Herndon's statement to Freeman was admitted properly as a statement against penal interest, but that Thomas's statement to Stover was not. The erroneous admission of the latter statement did not harm Herndon, however.

■ Finally, we consider Thomas's statements to Bell and Winston, which the trial court admitted only against their maker. Whether each statement required redaction for admission in evidence at appellants' joint trial, and whether any redactions made were adequate, are legal questions, we conclude.[30] Under both

26. *Accord Geter,* 929 A.2d at 431 n. 5 ("If the defendant who made the out-of-court statement does not testify, introduction of the unredacted statement into evidence would violate the co-defendant's Sixth Amendment right of confrontation if the statement is testimonial in nature and it would not be admissible against the co-defendant in a separate trial."); *United States v. Spotted Elk,* 548 F.3d 641, 662 (8th Cir.2008) (finding no *Bruton* issue where one co-defendant's reported utterance to another was not testimonial); *United States v. Williams,* 506 F.3d 151, 155–57 (2d Cir.2007) (upholding admission of co-defendant's statements against penal interest in joint trial on ground that nontestimonial statements presented no Confrontation Clause issue).

27. *See, e.g., United States v. Lamons,* 532 F.3d 1251, 1261 n. 15 (11th Cir.2008); *United States v. Brito,* 427 F.3d 53, 59 (1st Cir.2005).

28. *Laumer v. United States,* 409 A.2d 190, 203 (D.C.1979) (en banc).

29. *Id.*

30. The Supreme Court has examined redactions in two post-*Bruton* cases, *Richardson,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176, and *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), which we discuss below. Although neither case expressly announces the standard of review, they appear to treat the necessity and adequacy of redactions as issues of law. Nor have previous decisions of our court explicitly addressed the question, though, again, they appear to have engaged in de novo review. *See, e.g.,*

*Bruton* and *Carpenter*, the trial court has discretion to choose between redaction and severance; depending on the form and content of the statement, the court may well have considerable discretion respecting the method or type of redaction employed. But the need for redaction and the sufficiency of any redaction that the trial court chooses to require are legal questions, because the issue is whether, with or without redaction, there remains a "substantial risk" that a reasonable jury would be unable to follow a limiting instruction and would consider the incriminating extrajudicial statement against the non-declarant defendant. Thus, our review of whether the trial court erred with respect to whatever redactions it required is de novo. That said, however, Herndon did not object to the redaction of Winston's testimony or renew his motion to sever on

the ground that the redaction was inadequate. We therefore review that redaction only for plain error.[31] We hold that the trial court did not err in admitting Bell's testimony without redaction or plainly err in admitting Winston's redacted testimony.

## B. Were the Statements "Testimonial"?

 The Supreme Court has declined "to spell out a comprehensive definition of 'testimonial'" suitable for all cases.[32] Broadly speaking, though, for a statement to be "testimonial," it must be "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,'"[33] typically for use in the prosecution or investigation of a crime or under "circumstances objectively indicat[ing] that ... the primary purpose of the interrogation is to establish or prove

---

*Plater v. United States*, 745 A.2d 953, 960–62 (D.C.2000). For their part, the federal courts of appeals have not been of one mind on the issue. Some have viewed the adequacy of redaction as a question of law. *See, e.g., United States v. Ramos–Cardenas*, 524 F.3d 600, 606–07 & n. 5 (5th Cir.2008) (distinguishing between alleged Confrontation Clause violations, which are reviewed de novo, and severance issues, which are reviewed for an abuse of discretion); *United States v. Verduzco–Martinez*, 186 F.3d 1208, 1212 (10th Cir.1999) ("We review de novo the legal issue of whether the admission of the non-testifying codefendant's statements/confession in a joint trial violated the defendant's Sixth Amendment right to confrontation."); *United States v. Gillam*, 167 F.3d 1273, 1277 (9th Cir.1999) (appearing to treat adequacy of redaction as question of law); *United States v. Edwards*, 159 F.3d 1117, 1125 n. 4 (8th Cir. 1998) ("[T]he Supreme Court in *Gray* treated the threshold question whether the trial court properly construed *Bruton* and its progeny in admitting redacted out-of-court declarations as an issue of law, and we do likewise."). Other Circuits apparently have treated the adequacy of redaction as a matter within the trial court's discretion. *See, e.g., United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007) (stating "we ... review issues concern-

ing a district court's evidentiary rulings, such as the *Bruton* claim here, for abuse of discretion," despite clear *Bruton* error); *United States v. Yousef*, 327 F.3d 56, 150 (2d Cir. 2003) (holding that trial court did not abuse its discretion in deciding to redact confessions rather than sever, and that because redactions were not obvious, "admission of the redacted statement did not violate the *Bruton* doctrine and was not an abuse of discretion"); *United States v. Sotomayor–Vazquez*, 249 F.3d 1, 11–12 (1st Cir.2001) (holding that trial court did not abuse its discretion in admitting recorded conversations allegedly in violation of *Bruton* because statements were not so "powerfully incriminating" as to implicate Confrontation Clause).

31. *See, e.g., Comford*, 947 A.2d at 1186. Application of the plain error standard extends as well to the trial court's failure to grant Herndon a severance on account of the admission of Thomas's redacted statement to Winston. *See Hammond v. United States (Hammond II)*, 880 A.2d 1066, 1089 (D.C. 2005), *abrogated in part on other grounds by Davis*, 547 U.S. at 821, 126 S.Ct. 2266.

32. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354.

33. *Id.* at 51, 124 S.Ct. 1354.

past events potentially relevant to later criminal prosecution." [34] "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." [35]

By those measures, none of the four statements at issue here was "testimonial." All four involved casual remarks to acquaintances in which the speaker—Herndon or Thomas—confidentially admitted having committed or intending to commit a crime. It would be ludicrous to characterize any of the statements as a solemn declaration or as having been made to establish past facts for use in a criminal prosecution or investigation or otherwise. In each instance, the speaker "simply was not acting as a witness; [ ]he was not testifying. What [ ]he said was not 'a weaker substitute for live testimony' at trial." [36] We hold that the trial court did not err in concluding that the statements here were not testimonial and hence not subject to the strictures of *Crawford, Davis,* and *Bruton.*

## C. Declarations Against Penal Interest

 This jurisdiction has adopted the hearsay exception for declarations against penal interest set forth in Federal Rule of Evidence 804(b)(3), together with the Supreme Court's construction of that provision in *Williamson.* [37] The exception, a species of "statement against interest," provides that if the declarant is unavailable as a witness, the rule against hearsay does not exclude "[a] statement which ... at the time of its making ... so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." [38] The premise of this exception is that reasonable people usually do not make statements against their penal interest unless the statements are true; the statements are reliable, and therefore admissible, precisely insofar as they genuinely increase the declarant's exposure to criminal sanction. [39] Whether that condition is met in any given case "can only be answered in light of all the surrounding circumstances." [40] Thus, to ascertain

---

**34.** *Davis,* 547 U.S. at 822, 126 S.Ct. 2266. *See also Clarke v. United States,* 943 A.2d 555, 557–59 (D.C.2008); *Thomas v. United States,* 914 A.2d 1, 12 (D.C.2006).

**35.** *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354.

**36.** *Davis,* 547 U.S. at 828, 126 S.Ct. 2266 (citation omitted); *see, e.g., Clarke,* 943 A.2d at 557–59 (holding that victim's shocked exclamation to his mother that appellant had just thrown gasoline on him was not a testimonial statement); *Hammond II,* 880 A.2d at 1100 (holding that statements by conspirators to "close associates or co-conspirators, not to law enforcement officers," were not testimonial in nature); *United States v. Hendricks,* 395 F.3d 173, 181 (3d Cir.2005) (private conversation monitored by wiretap did not give rise to testimonial statements); *Horton v. Allen,* 370 F.3d 75, 83–84 (1st Cir.2004) (private conversation with friend did not give rise to testimonial statements).

**37.** *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (narrowly construing the term "statement"). *See United States v. Hammond (Hammond I),* 681 A.2d 1140, 1144–46 (D.C.1996); *see also Laumer,* 409 A.2d at 199; *Doret v. United States,* 765 A.2d 47, 65 (D.C.2000), *abrogated in part on other grounds by Crawford,* 541 U.S. at 60–65, 124 S.Ct. 1354 .

**38.** FED.R.EVID. 804(b)(3). The Rule goes on to provide that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.*

**39.** *Williamson,* 512 U.S. at 599–600, 114 S.Ct. 2431; *see also Laumer,* 409 A.2d at 196–97.

**40.** *Williamson,* 512 U.S. at 603–04, 114 S.Ct. 2431; *Doret,* 765 A.2d at 65.

whether a proffered statement is admissible under the penal interest exception, the trial court must undertake a three-step factual analysis. It must determine (1) whether the declarant, in fact, made the reported statement;[41] (2) whether the declarant is unavailable to testify;[42] and (3) "whether corroborating circumstances clearly indicate the trustworthiness of the statement."[43] The factors to be examined in the third step include the time of the declaration and the party to whom it was made; the existence of extrinsic evidence in the case corroborating the declaration; and—the fundamental criterion—the extent to which the declaration was "really against the declarant's penal interest" when it was made.[44]

■■■■■■■ In *Williamson*, the Supreme Court held that Rule 804(b)(3) does not allow admission of non-self-inculpatory statements simply because they happen to be included within "a broader narrative that is generally self-inculpatory."[45] Mere

---

41. "In determining whether the declarant in fact made the proffered statement, the trial court's focus is not on the truth of the declaration, but on the veracity of the witness who repeats the declaration." *Laumer*, 409 A.2d at 199.

42. The declarant may be unavailable at the time the statement is offered into evidence if, inter alia, he has asserted or would assert a valid privilege not to testify concerning the subject matter of the statement. *See* FED. R.EVID 804(a)(1); *Laumer*, 409 A.2d at 200. Thus, if the declarant is a co-defendant in a criminal trial in which the government seeks to introduce his statement in its case-in-chief, the unavailability requirement is satisfied because the government cannot call him to the witness stand, even though the co-defendant might later elect to testify in his defense.

43. *Laumer*, 409 A.2d at 199. By its express terms, Rule 804(b)(3) requires that corroborating circumstances clearly indicate the trustworthiness of the statement only when the statement of another is offered to *exculpate* the accused. See footnote 38, *supra*. In *Lyons v. United States*, 514 A.2d 423 (D.C. 1986), although we found it unnecessary to rule on the question, we observed that this same requirement "appropriately applies at least as forcefully" when the statement of another is offered to *inculpate* the accused, "because of the danger of admitting fabrications into evidence which cannot, by definition, be confronted through cross-examination." *Id.* at 429 n. 10. Since *Lyons*, we have recognized the force of that observation and have treated the "corroborating circumstances" requirement as applicable whether the statement is offered to exculpate or inculpate the defendant. *See Hammond II*, 880 A.2d at 1100; *Doret*, 765 A.2d at 62–64. In

its brief on appeal, the government does not contend otherwise.

The Supreme Court did not reach the question when it construed Rule 804(b)(3) in *Williamson*. *See* 512 U.S. at 605, 114 S.Ct. 2431. A majority of the Circuits have adopted the corroborating circumstances requirement for third-party penal interest statements offered to inculpate the accused, *see, e.g., United States v. Wexler*, 522 F.3d 194, 201–03 (2d Cir.2008); *United States v. Alvarez*, 584 F.2d 694, 701 (5th Cir.1978); *United States v. Franklin*, 415 F.3d 537, 547–48 (6th Cir. 2005); *Amer. Auto. Accessories, Inc. v. Fishman*, 175 F.3d 534, 540–41 (7th Cir.1999); *United States v. Honken*, 541 F.3d 1146, 1161–62 (8th Cir.2008); *United States v. Westry*, 524 F.3d 1198, 1214–15 (11th Cir.2008); *contra United States v. Jordan*, 509 F.3d 191, 202 n. 6 (4th Cir.2007). It must be noted, though, that some of these courts were influenced by the now-superseded Confrontation Clause jurisprudence of *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), under which the admissibility of hearsay statements against the accused turned on whether the statements had the requisite indicia of reliability. *See, e.g., Alvarez*, 584 F.2d at 700–02; *see also Wexler*, 522 F.3d at 201–02. *Cf.* Peter W. Tague, *Perils of the Rulemaking Process: The Development, Application, and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception*, 69 Geo. L.J. 851, 989–98 (1981) (questioning the justification for, and the constitutionality of, imposing a corroboration requirement on the defendant but not on the government).

44. *Laumer*, 409 A.2d at 200.

45. *Williamson*, 512 U.S. at 600, 114 S.Ct. 2431; *Hammond I*, 681 A.2d at 1144.

proximity to a self-incriminating assertion is not enough to support admission under the penal interest exception; the trial court must assess each component remark for admissibility as a statement against penal interest rather than base its ruling on the overall self-inculpatory quality of the declarant's narrative in its totality.[46] Accomplice statements-statements in which the declarants incriminate their putative confederates as well as themselves-demand "especially" careful parsing and evaluation by the trial court.[47] Frequently the accusations of others in such statements are not genuinely self-inculpatory, but "merely attempts to shift blame or curry favor."[48] Even if the remarks implicating others in criminal conduct are merely "collateral" and seemingly "neutral as to [the declarant's] interest,"[49] their admission in evidence pursuant to Rule 804(b)(3) depends on a clear showing that they are truly inculpatory of the declarant as well.

 This is not to imply that such a showing is never possible. "It would perhaps be fair to say that a portion of a statement inculpating another person is seldom against the declarant's penal interest, but seldom is not the same as never."[50] As the *Williamson* Court acknowledged, statements in a confession incidentally naming confederates "that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest."[51] Such a statement "is not magically transformed from [one] against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible co-defendant."[52] If that is true when the statement is made by an arrestee to the police, it is all the more true when the statement is made to close acquaintances in confidence, under circumstances manifesting no motive to shift blame or other bias.[53] We, in fact, upheld the admission

---

46. "The fact that a person is making a broadly self-inculpatory confession does make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Williamson*, 512 U.S. at 599–600, 114 S.Ct. 2431.

47. *Id.* at 601, 114 S.Ct. 2431 ("The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else.").

48. *Hammond I*, 681 A.2d at 1145 (quoting *Williamson*, 512 U.S. at 603, 114 S.Ct. 2431 (internal quotation marks omitted)). The suspect credibility of such accusations is well-established. *See, e.g., Lilly v. Virginia*, 527 U.S. 116, 131–32, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion) (emphasizing the "presumptive unreliability" of statements by accomplices that "shift or spread the blame" to others).

49. *Williamson*, 512 U.S. at 600, 114 S.Ct. 2431.

50. *Hammond I*, 681 A.2d at 1145.

51. *Williamson*, 512 U.S. at 603, 114 S.Ct. 2431.

52. *Id.* at 606, 114 S.Ct. 2431 (Scalia, J., concurring).

53. *See Laumer*, 409 A.2d at 201 ("The existence of a close relationship between the declarant and the witness also may provide indications of trustworthiness."); *United States v. Manfre*, 368 F.3d 832, 842 (8th Cir.2004) (upholding admission of statements "not made while facing trial, but ... instead made casually to an intimate confidante"); *Anthony v. DeWitt*, 295 F.3d 554, 564 (6th Cir.2002) ("[S]tatements made to a family member or perceived ally, in confidence, have previously been deemed sufficiently trustworthy."); *People v. James*, 93 N.Y.2d 620, 695 N.Y.S.2d 715, 717 N.E.2d 1052, 1065–66 (1999) (emphasizing lack of motivation to lie to trusted friend). That the declarant trusted his hearer not to report him to the police does not render the statement inadmissible under the penal interest exception. *See, e.g., Westry*, 524 F.3d at 1215 (considering statements made in

of such statements under the penal interest exception in *Hammond II*.[54]

### 1. Herndon's Statement to Freeman

Considering Herndon's statement to Freeman—"I killed him, Keith's gun jammed"—the trial court found that Herndon made the statement, and as a defendant he was unavailable to the prosecution. The court also found that Herndon had "no motive to color the information or to lie," and that the surrounding circumstances, the timing of the statement, and the identity of the person to whom it was made combined to "offer a fair degree of reliability as to [the] statement." These factual findings, which have ample support in the record and certainly are not clearly erroneous, weigh in favor of admitting Herndon's self-incriminating admission under the penal interest exception.[35] Herndon was speaking to a family member in private soon after the murder. In that setting, in contrast to, for example, a custodial interrogation by police, he had no apparent motive to lie, exaggerate, curry favor or shade the truth. Furthermore, Herndon's statement was corroborated by other evidence, including Thomas's own admissions and Herndon's subornation of his girlfriend's perjurious statements regarding his alibi.

The critical question, though, is whether *all* of Herndon's statement was "really against [*Herndon's own*] penal interest." Thomas argues that Herndon's references to *Thomas's* participation as an accomplice were collateral—they inculpated only Thomas, not Herndon, because they did not increase the criminal liability to which Herndon exposed himself by admitting guilt. Therefore, Thomas argues, the trial court should have parsed out the statements regarding Thomas and redacted them. We do not agree. Herndon's statement that Thomas was with him as they approached Fisher and that Thomas's gun jammed was not blame-shifting or beneficial to Herndon in any way. Nor was the statement merely neutral with respect to Herndon's interest, for it underscored that Herndon was the sole shooter and bore primary responsibility for Fisher's murder. Moreover, as *Williamson* anticipated, the statement also was contrary to the declarant's penal interest because it corroboratively revealed "significant details about the crime,"[56] including the identity of a witness (perhaps the only witness) who could identify Herndon as the chief perpetrator. We conclude that Herndon's statement about Thomas was sufficiently against Herndon's penal interest that a reasonable person in his position

confidence and stating, "[u]nder the circumstances presented here, we do not think a reasonable man would falsely admit to ... a serious crime, knowing there was a chance, albeit slight, that the admission could be used to subject him to severe penalties") (citing cases).

**54.** 880 A.2d at 1103.

**55.** Citing Freeman's recantation at trial, Thomas takes issue with the trial court's decision to credit her report of Herndon's statement in her sworn grand jury testimony and her statement to Detective Williams. But the recantation falls short of establishing that the court clearly erred. Freeman told Williams she would refuse to "testify[ ] against [her]

brother," admitting also that she had to "save fa[c]e with [her] brother and [her] family" by "giv[ing] the DA a hard time." Furthermore, we think it appropriate that the trial court's ruling allowed the jury to decide the question of Freeman's credibility. The jury heard both Freeman's statements at trial and those she had made prior to trial, and it had a fair opportunity to determine which were more reliable. *See, e.g., Wheeler v. United States*, 930 A.2d 232, 249 (D.C.2007) (noting that "to pass upon the credibility of witnesses ... is the function of the jury" (internal quotation marks omitted)).

**56.** *Williamson*, 512 U.S. at 603, 114 S.Ct. 2431.

would not have made the statement without believing it to be true. As the statement therefore was substantively admissible against Thomas as well as against Herndon, the trial court did not err under *Carpenter* in admitting it without redaction.[57]

### 2. Thomas's Statement to Stover

 We reach a different conclusion with respect to Thomas's statement to Stover, "that him and Ron was going to finish that shit with Slush." We take no issue with the trial court's subsidiary factual determinations. In finding that Thomas made the statement, as Stover had testified under oath in the grand jury and in her voir dire examination, the trial court noted Stover's "remarkable," emotional demeanor when she recounted it. Despite Stover's subsequent repudiation of her testimony, the court's finding was supported by the evidence and certainly not clearly erroneous. That Thomas was unavailable is not contested. As to whether corroborating circumstances supported the trustworthiness of Thomas's statement to Stover, the trial court noted in particular that Thomas "would feel comfortable making a statement like this to her" given the nature of their relationship, and that the statement was not blame-shifting. (And, of course, Thomas was retrieving his gun when he made the statement.) These find-

ings too are sufficiently supported by the record.

Nonetheless, it is critical not to lose sight of the touchstone inquiry for admission of hearsay under the penal interest exception, which is whether the statement "*at the time of its making* ... so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." [58] Had Thomas said to Stover, shortly *after* Fisher was murdered, that he and Ron had *finished* the business with Slush, we think his statement rather clearly would have subjected him to criminal liability. Obviously, however, at the time Thomas actually made his remark to Stover, the murder of Fisher had not yet been committed; it lay in the uncertain future. Even in conjunction with his retrieval of a weapon, Thomas's words were somewhat ambiguous. Were they simply braggadocio? Did they mean that Thomas already had made plans with Herndon or only that he anticipated Herndon's help? Most important, what, exactly, did Thomas intend to do? The statement was cryptic. We do not question that a statement regarding a planned future crime may qualify under the penal interest exception in some circumstances. For example, a detailed description to the FBI of how a complex crime was to be committed might

---

**57.** Although, as previously mentioned, Freeman's grand jury testimony was admissible as substantive evidence of Herndon's statement pursuant to D.C.Code § 14–102(b)(1), *see* footnote 8, *supra*, her account of that statement to Detective Williams was admissible solely for the non-substantive purpose of impeaching her testimony at trial. Thomas argues that the trial court erroneously admitted Williams's impeaching testimony as substantive evidence of Herndon's statement (which would have been a Confrontation Clause violation, inasmuch as Freeman's statement to Williams was testimonial). It is true that the court did not give a limiting instruction when

Freeman was impeached, but Thomas did not request one. Assuming *arguendo* that the court erred "plainly" by failing to give a limiting instruction sua sponte, *see Lofty v. United States*, 277 A.2d 99, 101 (D.C.1971); *Johnson v. United States*, 387 A.2d 1084, 1087 n. 5 (D.C.1978) (en banc), we see no reasonable likelihood that the omission had a "prejudicial effect on the outcome of the trial," *Thomas*, 914 A.2d at 21, for Williams's testimony was entirely duplicative of Freeman's properly admitted grand jury testimony.

**58.** Fed.R.Evid. 804(b)(3) (emphasis added).

subject the speaker to liability for criminal conspiracy;[59] a statement implying that the declarant had ordered someone's murder might be admissible to prove the declarant's culpability in the subsequent deed.[60] Here, however, we are persuaded that Thomas's remark to Stover did not clearly expose him to criminal liability *at the time he made it.*

■ On the other hand, we conclude that the error in admitting the unredacted statement against Herndon under the penal interest exception was obviously harmless.[61] (Since neither the admission of the statement nor the failure to redact it rises to the level of constitutional error, we apply the less stringent harmlessness standard of *Kotteakos v. United States.*[62]) First, we agree with the alternative theory of admissibility the government advanced in the trial court in its motion in limine (which the trial court did not reach).[63] Thomas's statement of his intention to meet with Herndon and finish the business with Slush fit within the state-of-mind exception to the hearsay rule. It was admissible against Herndon under that excep-

tion because it made it more likely that Thomas did, in fact, meet with Herndon, and that Thomas did, in fact, participate in the shooting of Fisher.[64] And had the statement been admitted under the state-of-mind exception, the government would not have been required by *Carpenter* to redact it to eliminate the reference to Herndon.[65]

■ Second, even apart from Thomas's statement to Stover, the evidence against Herndon was quite strong. The jury heard that Herndon, distraught, asked what "Slush's" killer looked like and received a description resembling Fisher; that Davis identified Herndon ("Little Man") as Fisher's assailant; that Herndon induced his then-girlfriend to provide him with a false alibi; that shortly after Fisher's murder, Herndon was in possession of a semiautomatic weapon consistent with the type of weapon used to kill Fisher; that Herndon admitted the killing to his sister; and that he told Bell he was "in the middle of what was done." On this record, we can say "with fair assurance . . . that the judgment was not substantially swayed

---

**59.** *See United States v. Keltner,* 147 F.3d 662, 670–71 (8th Cir.1998).

**60.** *See United States v. Layton,* 720 F.2d 548, 558–61 (9th Cir.1983).

**61.** *See Randolph v. United States,* 882 A.2d 210, 223 (D.C.2005); D.C.Code § 11–721(e) (2001) ("On the hearing of any appeal in any case, the District of Columbia Court of Appeals shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.").

**62.** 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See Smith v. United States,* 809 A.2d 1216, 1225 (D.C.2002).

**63.** *See Prince v. United States,* 825 A.2d 928, 931 (D.C.2003) (noting that "an appellate court may uphold a trial court decision for reasons other than those given by that court").

**64.** *See, e.g., McBride v. United States,* 441 A.2d 644, 651–52 ("[T]he declarant's expression of intention to perform an aggressive act increases the likelihood that the declarant did so. Such expressions are admissible under the 'state of mind' exception to the hearsay rule."); *Clark v. United States,* 412 A.2d 21, 29 (D.C.1980) ("It is well-settled that the declarant's statement of future intent to perform an act is admissible to show that the declarant did perform the act, if the performance of the act is at issue.").

**65.** Thomas's statement was not admissible to prove *Herndon's* intentions or anticipated conduct, however. *See Clark,* 412 A.2d at 29–30. Had the trial court admitted Thomas's statement under the state-of-mind exception, Herndon therefore would have been entitled to a limiting instruction.

by the error."[66] And as Herndon sustained no material prejudice from Thomas's statement to Stover, its admission did not require the court to grant him a severance.

## D. Redaction

Having determined that Thomas's statements to Bell and Winston were not admissible against Herndon under any hearsay exception, the trial court was obliged under Criminal Rule 14 and *Carpenter* to take reasonable steps to ensure that Herndon would not be prejudiced by the introduction of those statements. Under *Carpenter*, as under *Bruton*, the necessity and sufficiency of any redactions turn on the same considerations—whether Thomas's extrajudicial statements (with or without excisions) so "powerfully" incriminated Herndon as to create a "substantial risk" that a reasonable jury would be unable to follow the court's limiting instruction and would consider those statements in deciding Herndon's guilt.[67] Consequently, the principles governing redaction under *Bruton* apply under *Carpenter* as well.

The Supreme Court addressed redaction under the *Bruton* doctrine in two subsequent cases. In *Richardson v. Marsh*, the Court distinguished between an extrajudicial confession that "expressly" implicates the non-declarant co-defendant (such as the confession in *Bruton* itself) and a confession that (at least as redacted) does not name the non-declarant co-defendant.[68] Where, as in the latter case, "the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial," the Court found it to be "a less valid generalization that the jury will not likely obey the instruction to disregard the evidence":

> Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. In short, while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton's* exception to the general rule [that jurors follow instructions].[69]

**66.** *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239. Herndon also argues that the trial court erred in failing to exclude testimony by Detective William Riddle because it was a "recitation of what Stover told him." (Herndon Br. 17.) We disagree. Detective Riddle merely testified that he was present when Stover met with prosecutors shortly before trial, at which time "Stover related to [the prosecutor] that [her] grand jury [testimony] was true." Riddle did not provide further details; his testimony thus was confined to telling the jury that Stover had made a statement inconsistent with her trial testimony (in which she said her grand jury testimony was false). The prior inconsistent statement, which raises no *Bruton–Carpenter* issue, was admissible to impeach Stover. *See, e.g., R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 537 (D.C.1991). The trial court did not err in admitting Riddle's testimony.

**67.** *See Carpenter*, 430 A.2d at 503; *Bruton*, 391 U.S. at 126, 135, 88 S.Ct. 1620.

**68.** 481 U.S. at 208, 107 S.Ct. 1702 (quoting *Bruton*, 391 U.S. at 124 n. 1, 88 S.Ct. 1620).

**69.** *Id.* The Court also noted the practical difficulties of applying *Bruton's* requirements to confessions that do not incriminate the non-declarant co-defendant on their face, but only when considered in connection with other evidence. *Id.* at 208–10, 107 S.Ct. 1702.

Declining to "extend" *Bruton* further than its rationale warranted, the *Richardson* Court held that the Confrontation Clause "is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." [70]

This was a rather narrow holding; narrower than the principle implied by the Court's reasoning that only "facially incriminating" confessions trigger *Bruton's* requirements.[71] To underscore the point, the Court "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." [72] The Court addressed that issue eleven years later, in *Gray v. Maryland.*

In *Gray*, the prosecution redacted the co-defendant's confession "by substituting for the defendant's name in the confession a blank space or the word 'deleted.' "[73] This redaction, the Supreme Court held, was inadequate to protect the non-declarant defendant's Sixth Amendment rights: "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration ... leave statements that, considered as a class, so closely resemble *Bruton's* unredacted statements that ... the law must require the same result" as in *Bruton* it-

self.[74] The basic problem with such obvious alterations, the Court explained, is that typically they "will not likely fool anyone"; a juror "would know immediately" whose name has been removed.[75] Distinguishing *Richardson*, which concededly "placed outside the scope of *Bruton's* rule those statements that incriminate [only] inferentially," [76] the *Gray* Court reasoned that obviously altered statements continue to incriminate the non-declarant defendant "directly" and "facially":

> *Richardson* must depend in significant part upon the *kind* of, not the simple *fact* of, inference. *Richardson's* inferences involved statements that did not refer directly to the defendant himself and which became incriminating "only when linked with evidence introduced later at trial." The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial. Moreover, the redacted confession with the blank prominent on its face, in *Richardson's* words, "*facially* incriminates" the codefendant. Like the confession in *Bruton* itself, the accusation that the redacted confession makes "is more vivid than inferential incrimina-

---

70. *Id.* at 211, 107 S.Ct. 1702.

71. *Id.*

72. *Id.* at 211 n. 5, 107 S.Ct. 1702.

73. 523 U.S. at 188, 118 S.Ct. 1151. "Consequently, the police detective who read the confession into evidence said the word 'deleted' or 'deletion' whenever Gray's name or Vanlandingham's name appeared.... The State also introduced into evidence a written copy of the confession with those two names omitted, leaving in their place blank white spaces separated by commas." *Id.* at 188–89,

118 S.Ct. 1151. (Vanlandingham was an accomplice who died before trial.)

74. *Id.* at 192, 118 S.Ct. 1151.

75. *Id.* at 193, 118 S.Ct. 1151. Moreover, "the obvious deletion may well call the jurors' attention specially to the removed name," and thus "may overemphasize the importance of the confession's accusation." *Id.*

76. *Id.* at 195, 118 S.Ct. 1151.

tion, and hence more difficult to thrust out of mind." [77]

 Taken together, *Richardson* and *Gray* instruct that a defendant's extrajudicial statement normally may be admitted in evidence in a joint trial (with an appropriate limiting instruction, we emphasize) so long as the statement, as redacted if necessary, does not incriminate a non-declarant co-defendant *on its face*, either explicitly or by direct and obvious implication. A statement satisfying that condition normally is admissible (with the limiting instruction) even though it alludes nonspecifically to the declarant's confederates and the non-declarant co-defendant may be linked to it by other, properly admitted evidence of his guilt. [78] We take these principles to be applicable under *Carpenter* and Criminal Rule 14 as well as under the Confrontation Clause. Caveats are in order, however.

First, the principles we extract from *Richardson* and *Gray* are guidelines for the mine run of cases, not ironclad rules for every case no matter what the circumstances. We recognize that Criminal Rule 14 sometimes may oblige the trial court to take ameliorative steps beyond a mere limiting instruction to protect a defendant from highly prejudicial, inadmissible hearsay in a co-defendant's confession, even where the confession does not directly inculpate the defendant on its face. Particularly in close cases, moreover, the trial court properly may exercise its remedial discretion under Rule 14 (and *Bruton* ); the court is not *required* to rely solely on a limiting instruction about which it has its doubts, merely because it permissibly might do so. [79]

Additionally, the foregoing guidelines do not mean that evidence extrinsic to the statement *never* may be considered in evaluating whether the statement facially incriminates the non-declarant co-defendant. "Very little evidence is incriminating when viewed in isolation; even most confessions depend for their punch on other evidence. To adopt a four-corners [of the hearsay statement] rule would be to undo *Bruton* in practical effect." [80] The circumstances surrounding the making of the extrajudicial statement that are put before the jury—when, to whom, and in whose presence it was made, for example—must be considered in interpreting the words used. To illustrate the point,

---

**77.** *Id.* at 196, 118 S.Ct. 1151 (citations to *Richardson* omitted).

**78.** *See Riley v. United States,* 923 A.2d 868, 886 (D.C.2007) ("Inferences that are considered offensive to *Bruton's* principles are those that allow the jury to infer *from the redactions themselves* that the co-defendant was a part of the criminal enterprise ...."); *see also Plater,* 745 A.2d at 960–61.

**79.** "[T]he line between testimony that falls within *Bruton's* scope and that which does not is often difficult to discern." *United States v. Jass,* 569 F.3d 47, 56 n. 5 (2d Cir. 2009) (internal quotation marks and citation omitted). Thus, the Second Circuit has encouraged trial courts, "wherever possible,"

to eliminate completely from a confession any mention of a non-declarant defendant's existence, as in *Richardson v. Marsh.* *See*

[481 U.S.] at 211, 107 S.Ct. 1702; *United States v. Castro,* 813 F.2d 571, 576–77 (2d Cir.1987) (observing that while redactions that completely eliminate any mention of co-defendant undoubtedly change meaning of statement somewhat, they are permissible as long as "[t]he gist of [the declarant defendant's] statement [is] presented without unduly prejudicing either the right of [the co-defendant] to avoid being implicated by a [declarant] defendant's out-of-court statement, or the right of [the declarant defendant] to have his conduct and statement presented in context").
*Id.*

**80.** *United States v. Hoover,* 246 F.3d 1054, 1059 (7th Cir.2001) (finding *Bruton–Gray* error where confession referred to "incarcerated leader" and "unincarcerated leader" of a conspiracy).

consider the simple comment, "We robbed the bank." By itself, the word "we" does not identify anyone other than the declarant. But a jury learning that the declarant made the comment while standing next to the co-defendant could understand that "we" unambiguously included the co-defendant. (Indeed, if the co-defendant heard the comment and did not demur, his silence arguably might be taken as manifesting adoption of the statement.[81]) Similarly, as the *Gray* Court helpfully elaborated, a confession implicating the non-declarant co-defendant by a nickname or specific description usually would "fall inside, not outside, *Bruton's* protection," even though the jury presumably would require extrinsic evidence that the co-defendant bore the nickname or met the description in order to connect him to the confession.[82] The reason is that once such evidence of identity is presented, all of *Bruton's* concerns about the inefficacy of a limiting instruction apply with full force, just as if the

confession had identified the co-defendant by his full given name. Some extrinsic evidence of the co-defendant's identity thus seems to us distinguishable for these purposes from extrinsic evidence of the co-defendant's guilt.[83] But—ordinarily—genuinely non-specific references to jointly-tried co-perpetrators need not be excised from the confession. In *Gray*, for example, the Court suggested that a statement redacted to say that the declarant "and a few other guys" committed the offense would not have run afoul of *Bruton*.[84] In *Plater*, we similarly approved a redacted confession that used the "neutral plural pronoun 'we'" to refer to the group that committed the offense, because, under the circumstances, "we" was indefinite; the term did not identify anyone with particularity other than the declarant.[85] (We also noted in *Plater* that "there was no symmetry between the number of alleged perpetrators and the number of defendants on trial; therefore, it was wholly questionable

---

81. *See Comford,* 947 A.2d at 1185.

82. *Gray,* 523 U.S. at 195, 118 S.Ct. 1151; *see also id.* at 201–02, 118 S.Ct. 1151 (Scalia, J., dissenting).

83. *See, e.g., United States v. Gonzalez,* 183 F.3d 1315, 1322–23 (11th Cir.1999) (finding physical description of person referred to as "Colombian," as well as other issues, to violate *Bruton,* but holding it harmless error), *overruled on other grounds by United States v. Diaz,* 248 F.3d 1065, 1107–08 & n. 59 (11th Cir.2001); *United States v. Gillam,* 167 F.3d 1273, 1277 (9th Cir.1999) (holding that redaction violated *Bruton* because it plainly referred to the defendant by inculpating "someone who worked at the FDA ... who was getting ready to retire").

84. *Gray,* 523 U.S. at 196, 118 S.Ct. 1151.

85. 745 A.2d at 961 (noting that the plural pronoun "in no way specifically linked Plater to the crime because there was no dispute that the incident was a group assault.... [T]he term 'we' does not connote a particular number of people or single out any individual

person."); *see also, e.g., Jass,* 569 F.3d at 61 (holding that references to "another person" satisfied requirements of *Bruton* and *Gray,* where testimony "plausibly put those neutral words in [declarant defendant's] mouth, ... and in no way suggested to the jury that [he] had provided ... the actual name of his accomplice"); *United States v. Ramos–Cardenas,* 524 F.3d 600, 608–10 (5th Cir.2008) (finding no *Bruton–Gray* error where officer relating hearsay confession accidentally said "they crossed [the Rio Grande into the country]," rather than "I crossed," because "the use of an indefinite pronoun does not so obviously refer to specific individuals, and ... nothing in the statement 'they crossed' ... gives rise to inferences so strong that they would be made immediately if the statement were the first item introduced at trial"); *United States v. Edwards,* 159 F.3d 1117, 1125–26 (8th Cir. 1998) (holding, after *Gray,* that use of "we" and "they" did not contravene *Bruton* ); *cf. United States v. Hardwick,* 544 F.3d 565, 572–73 (3d Cir.2008) (finding harmless *Bruton* error where trial court redacted names so that confession referred to "others in the van" with declarant, but left little doubt as to who the others were).

whether any of the defendants, other than the defendant who gave the statement, were involved in the offense."[86] However, even where there was only one accomplice and only one co-defendant is on trial with the declarant, the use of a non-specific pronoun like "we" or "he" is ordinarily acceptable under *Bruton* and *Carpenter*.) Of course, as *Gray* teaches, when the names of co-defendants are replaced by neutral pronouns, the substitution must be accomplished artfully, so as not to indicate to the jury that the statement originally contained actual names.[87] An obvious redaction would imply too strongly that the statement implicated the non-declarant co-defendant by name.

### 1. Thomas's Statement to Bell

■ Applying the foregoing guidelines to the case at hand, we find no error in the trial court's conclusion that Thomas's statement to Bell required no redaction. Bell quoted Thomas as saying "they handled that" when the conversation turned to Slush and how he was missed. As in *Plater*, the use of the plural pronoun identified no one other than the declarant, Thomas; nothing in the remark itself or the circumstances in which it reportedly was made identified Herndon.[88]

### 2. Thomas's Statement to Winston

■ Thomas's statement to Winston was redacted to avoid identifying Herndon. In pertinent part, the jury heard only that Thomas told Winston he was "with someone" on "a friend's relative['s] porch" when they mistakenly thought they "saw the person they was beefing with"; and that he was not the one who then shot the person, implying that his companion ("someone") did so. Herndon contends that the redaction was insufficient to disguise his identity, though his name was not mentioned, apparently because the jury heard from other witnesses that the shooters were on Angela Freeman's porch, she was Herndon's relative (half-sister), and he was "Keith's" good friend.[89]

As Herndon did not object at trial to the sufficiency of the redaction of Thomas's remarks to Winston or renew his severance motion, his claim is subject to the demanding requirements of plain error review. Herndon must demonstrate not only that the redaction was erroneous, but that it was obviously so at the time the issue arose, and, further, that there exists a reasonable probability the error affected his substantial rights by prejudicially affecting the outcome of the trial.[90] In addition, Herndon must show that the error seriously affected the fairness, integrity, or public reputation of the judicial proceeding, as by causing a clear miscarriage of justice.[91]

The requisite showing has not been made. The references in Thomas's redacted account to "someone" who was with him

---

86. 745 A.2d at 961.

87. *See Jass*, 569 F.3d at 56 & n. 5, 62 n. 7.

88. To reiterate the point made earlier, we might reach a different conclusion if Bell had testified to a private conversation about Slush with Thomas and Herndon together in which Thomas said "they handled that."

89. Of course, the jury also heard that Herndon himself had admitted being on Freeman's porch with Thomas and shooting Fisher (though at trial Herndon disputed having made such an admission). But a co-defendant's unredacted (or inadequately redacted) confession may be inadmissible under *Bruton* even if the non-declarant co-defendant implicated in the confession has confessed as well. *Cruz v. New York*, 481 U.S. 186, 193, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).

90. *See Comford*, 947 A.2d at 1189.

91. *Id.* at 1190.

on a "friend's relative's" porch were not repetitive or otherwise obvious alterations of the sort condemned in *Gray*.[92] And even if we indulgently suppose that the jury must have understood the "friend" in question to have been Herndon, Winston did not convey that the "friend" was also the "someone" who committed the shooting. The fact that Thomas was with "someone" on Herndon's sister's porch did not necessarily mean he was with Herndon himself. Thus, we have difficulty perceiving that the redaction was plainly insufficient. Moreover, given the strength of the other evidence against him, we see no reasonable likelihood that the admission of Thomas's remarks to Winston materially prejudiced Herndon (or resulted in a miscarriage of justice) even if the redaction was insufficient for the reasons he claims. Herndon is not entitled to relief.

### III. The Jury Instruction on Aiding and Abetting Liability

 Appellants contend that the trial court erred when it instructed the jury on accomplice liability for first-degree premeditated murder. The court told the jury that "[a]n aider and abetter is legally responsible for the acts of other persons that are the natural and probable consequences of the crime in which he intentionally participates." As appellants did not object to this language, they must estab-

lish that the court plainly erred in order to obtain relief.[93] Error there was. Our 2006 en banc decision in *Wilson–Bey* overruled previous case law and rejected the "natural and probable consequences" instruction with respect to aiding and abetting liability for first-degree premeditated murder because it eliminates the requirement that the aider and abettor have the same *mens rea* required of the principal— to wit, a premeditated and deliberated intent to kill.[94] As the pertinent law was clearly otherwise at the time of appellants' trial in 2004, they need only show that the trial court's error is plain or obvious *now*, which it is, to satisfy the second prong of plain error analysis as well.[95] However, appellants still must satisfy the third and fourth prongs of the test for plain error by demonstrating a reasonable probability of prejudice and an adverse impact on the fairness, integrity or public reputation of the proceeding.[96] And that is where their showing falls short.

The sole defense in the case was misidentification. The evidence unambiguously demonstrated the appellants' premeditation, deliberation and intent to kill; e.g., Thomas's remark to Stover "that him and Ron was going to finish that shit with Slush"; Herndon's effort to discover who killed Slush; his admission that "they had to do what they had to do because of Slush"; and the shooting of Fisher in the

---

92. *Compare United States v. Coleman*, 349 F.3d 1077, 1085–86 (8th Cir.2003) (holding that a handful of references to "someone else" did not violate *Bruton* because they did not signal that a redaction had been made), *with United States v. Richards*, 241 F.3d 335, 338, 341–42 (3d Cir.2001) (holding, in light of testimony that co-defendants were friends, that the repetitious reference to "my friend" in a detailed, redacted confession violated *Bruton*). *See also United States v. Williams*, 429 F.3d 767, 773–74 (8th Cir.2005) (noting possibility of *Bruton* violation where the redaction was "not seamlessly woven into the narrative ..., and the neutral pronoun 'some-

one' may have lost its anonymity by sheer repetition").

93. Appellants objected to the aiding and abetting instruction only on the ground that there was insufficient evidence to justify it. They have not pursued that contention on appeal.

94. *Wilson–Bey v. United States*, 903 A.2d 818, 830 (D.C.2006) (en banc).

95. *See Downing v. United States*, 929 A.2d 848, 863 (D.C.2007).

96. *See id.*

back. There was no evidence that Fisher's murder was the unintended (or unplanned) result of any other crime in which Thomas or Herndon intentionally participated. There is no reasonable chance that the erroneous "natural and probable consequences" language caused the jury to reach the wrong result in this case.

## IV. Other Issues

### A. Admission of Detective Williams's Testimony That He Believed Angela Freeman

 Herndon contends the trial court erred in permitting Detective Williams to testify that he believed Angela Freeman when she told him her brother had admitted killing Fisher. We disagree. Williams, who was called to impeach Freeman after she recanted her grand jury testimony, testified that he took her to the grand jury and then to the witness protection office after she initiated contact with him and provided a "detailed description" of her conversation with Herndon. On cross-examination, Herndon's attorney suggested that Freeman "had to satisfy" Williams by falsely inculpating her brother because she felt "under pressure" from other people in the neighborhood and wanted the financial and relocation assistance that came with being a government witness. Along the same lines, Thomas's counsel suggested that Freeman's information became progressively more inculpatory over the course of her contacts with the police. In the course of his cross-examination, he asked Williams whether he had believed Freeman when she said she was afraid of other people in the neighborhood.

Thereafter, on redirect examination, the prosecutor asked Williams if he had believed Freeman "when she said her brother was the one." Herndon's objection to the question was overruled and Williams was permitted to answer in the affirmative.

 Herndon invokes the principle that "one witness may not express a view or an opinion on the ultimate credibility of another witness' testimony." [97] This principle has been applied, paradigmatically though not exclusively, when a plaintiff or defendant is asked whether or why he thinks the opposing party's witnesses are lying.[98] Such questions are improper for several reasons: "[c]redibility determinations are the province of the jury"; they present a false dichotomy between truthful and perjured testimony by leaving aside the possibility of mere error; and they ask the defendant witness to speculate *why* the other witnesses' testimony is incorrect when he may have no basis to know, betraying the interrogator's fundamentally rhetorical purpose.[99]

Here, though, Williams was not asked to opine on Freeman's credibility as a witness or otherwise, but only to say whether he in fact believed her out-of-court statements before he brought her to the grand jury. The evident purpose of the prosecutor's question was to rehabilitate Williams following defense counsel's suggestion on cross-examination that he had agreed to provide relocation assistance to Freeman in exchange for false testimony. Williams's testimony was admissible for the limited purpose of establishing that he did not act improperly in interviewing

97. *Carter v. United States*, 475 A.2d 1118, 1126 (D.C.1984).

98. *See, e.g., Allen v. United States*, 837 A.2d 917, 919–21 (D.C.2003) (holding it improper for prosecutor to ask defendant, "Do you know a reason why Officer James Johnson would come into this courtroom and lie against you?"); *Freeman v. United States*, 495 A.2d 1183, 1186–87 (D.C.1985) ("While cross-examining appellant, the prosecutor asked him if he knew of any reason why the government's witnesses might be lying.").

99. *Allen*, 837 A.2d at 920.

Freeman, bringing her to the grand jury, and helping her to relocate.[100]

### B. Admission of Freeman's Testimony That Herndon Had a Firearm

 Herndon contends the trial court abused its discretion by admitting Freeman's grand jury testimony, which she disavowed at trial, that she saw Herndon with a firearm four days after the murder. On the contrary, the prior sworn testimony was admissible as substantive evidence,[101] and it was relevant because it showed Herndon's possession of what reasonably could have been the murder weapon soon after the shooting.[102] Evidence that the defendant possessed an instrumentality of the crime does not need to meet the strict standard for the admission of so-called "other crimes" evidence.[103]

### C. Sufficiency of the Evidence

 Lastly, viewing the evidence as we must, in the light most favorable to the government, we are satisfied that it was sufficient to sustain appellants' convictions.[104] Herndon asked what Slush's killer looked like; he obtained a description that would explain his shooting of Fisher by mistake; he possessed a gun that could have been the murder weapon; he admitted killing Fisher to his sister; a witness to the murder (Davis) identified him; and

he manifested consciousness of guilt by persuading his girlfriend to supply him with a false alibi. Thomas announced his intent to revenge Slush's killing while retrieving a weapon for the evident purpose of doing so; he later admitted being an accomplice to Fisher's murder; and his admissions were corroborated by other evidence, notably including (but not limited to) Herndon's statement to his sister that "Keith" was with him and his gun jammed. Reasonable jurors could credit the government's evidence and find each appellant guilty beyond a reasonable doubt.

*Affirmed.*

**100.** *See Robinson v. United States,* 797 A.2d 698, 707 (D.C.2002) (holding that the trial court properly admitted a detective's testimony that he had not believed a witness who denied having seen a shooting, because the testimony was "offered for the limited purpose of explaining the detective's decision to continue to seek out and eventually re-interview" the witness). Herndon might have been entitled to a limiting instruction regarding the jury's consideration of Detective Williams's testimony, *see id.* at 707 n. 14, but he did not request one and does not argue on appeal that its omission was plain error.

**101.** See D.C.Code § 14–102(b)(1), quoted in note 8, *supra.*

**102.** *See, e.g., Busey v. United States,* 747 A.2d 1153, 1165 (D.C.2000) ("It is true that the evidence established only a reasonable probability, and not a certainty, that Busey possessed the murder weapon two days before the murder. But the connection of the gun with the murder was not 'conjectural and remote,' and so the lack of certainty goes to the weight of the evidence, not its admissibility.") (citations omitted).

**103.** *Id.*

**104.** *See, e.g., Timberlake v. United States,* 758 A.2d 978, 980–81 (D.C.2000) (stating standard of review for sufficiency of the evidence).