*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 09-CF-627, 12-CO-621, 09-CF-629, 09-CF-651, 09-CF-652, 09-CF-679,
12-CO-656, 12-CO-657

CHARLES E. MOBLEY,

DANTE CARPENTER,

AND

GERALD A. THOMPKINS,

APPELLANTS,

v.

UNITED STATES,

APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF3-27290-07, CF2-9878-08, CF3-28751-07)

(Hon. Harold L. Cushenberry, Jr., Trial Judge)

(Argued December 6, 2013                    Decided October 16, 2014)

*Jennifer Wicks*, appointed by the court, for appellant Charles E. Mobley.

*Shilpa S. Satoskar*, Public Defender Service, with whom *James Klein*, Public Defender Service, was on the brief, for appellant Dante Carpenter.

*Judith A. Lovelace*, appointed by the court, for appellant Gerald A. Thompkins.

*David B. Goodhand*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Melinda Williams*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, THOMPSON, *Associate Judge*, and REID, *Senior Judge*.

REID, *Senior Judge*: A jury convicted appellants, Charles E. Mobley, Dante Carpenter (aka Cornell Swangin), and Gerald A. Thompkins, of multiple criminal offenses arising from the firing of numerous gunshots at a nightclub in the Northeast quadrant of the District of Columbia, a police chase of the perpetrators, and alleged efforts by two of the co-defendants to obstruct justice and to attempt tampering with physical evidence.[1] Appellants raise multiple challenges to their convictions. For the reasons set forth below, we affirm the trial court's judgment in part, reverse it in part, and remand the case for resentencing. Specifically, (1)

---

[1] The charges on which the trial court sentenced each appellant included: assault with a dangerous weapon (ADW) (five counts), D.C. Code § 22-502 (2012 Repl.); assault on a police officer while armed (APOWA) (two counts), D.C. Code §§ 22-405 (c), -4502; carrying a pistol without a license (CPWL), D.C. Code § 22-4504 (a); and possession of a weapon during commission of a crime of violence (PFCV) (7 counts), D.C. Code § 22-3204 (b). Mr. Carpenter and Mr. Mobley were sentenced as felons in possession of pistols (D.C. Code § 22-4504 (a)); Mr. Thompkins on an attempt tampering charge (D.C. Code § 22-723, -1803); and Mr. Carpenter and Mr. Thompkins on charges of obstructing testimony (D.C. Code § 22-722 (a)(2)(A)) and obstructing the due administration of justice (D.C. Code § 22-722 (a)(6)).

we conclude that the trial court did not abuse its discretion by denying Mr. Mobley's motion for severance; (2) on the merger issues, we hold that appellants' ADW convictions pertaining to Officers Geddies and Evely merge with the APOWA convictions relating to those officers, and that the seven PFCV convictions of each appellant merge into one, but we reject the other merger arguments advanced by Mr. Mobley and Mr. Carpenter; (3) we are not persuaded by Mr. Thompkins's argument that his two APOWA felony convictions must be reduced to misdemeanors; (4) we vacate Mr. Thompkins's and Mr. Carpenter's obstruction of justice convictions; (5) we affirm Mr. Thompkins's attempted tampering conviction; (6) we affirm Mr. Thompkins's CPWL conviction; and (7) we affirm the trial court's remand decision denying appellants' new trial motion based on juror misconduct.

## FACTUAL SUMMARY

The government presented testimony from numerous witnesses concerning multiple gunshots outside a nightclub around 3 a.m. on November 24, 2007. Prior to 3 a.m., Metropolitan Police Department Officers, Samuel Geddies, Gregory Evely, James Sulla, and Lance Bishop arrived at Club Envy, located at Queens Chapel Road and Adams Street, Northeast. They occupied separate, marked police

vehicles and wore police uniforms. They were assigned to traffic and crowd control due to a large crowd at the club. Officers Evely and Bishop were parked at Queens Chapel Road and Adams, about five feet from Club Envy. Officer Geddies stationed his vehicle about two feet from Officer Evely's car, and Officer Bishop about seven feet from Officer Evely's car. Officer Sulla was parked across from Club Envy, about ten feet away from Officer Evely.

Ralph Anwan Glover and his Backyard Band had performed at the club. Because he was wet from perspiration, Mr. Glover decided to go to his car, parked on the side of the club near the entrance, to get his "tee shirt." He testified that he had not experienced any problems or been involved in any altercations or arguments during his performance, and he left the club alone. He had almost reached his vehicle when gunshots began to "whistle" past his face. He "got down on the ground." He estimated that there may have been ten, fifteen rounds fired past his face, and a total of about twenty to thirty shots. The shots were coming from two directions. He could not see who was firing the shots. He crawled between cars until he reached an alley, and then he ran up the alley, made his way back to his vehicle, and drove home.

Officers Geddies, Evely, Sulla, and Bishop also were in the line of fire. Officer Geddies was inside his police car, facing the club, when he thought he heard gunfire to his left. He turned and noticed "what looked like some type of altercation . . . a block down the street." He exited his vehicle and saw someone shooting at him. The individual stood next to a black vehicle. Officer Geddies also observed two or three other individuals shooting at "someone or something" — firing at the wall of the club or vehicles. He heard gunshots hitting his car and "vehicles around" him. As he approached the altercation, someone fired at him. He took cover and "returned fire," after yelling, "Police." Officer Evely was "pinned down" behind his vehicle. Officer Geddies saw four individuals leave the scene in the black vehicle.

Officer Evely gave the following testimony. He was outside his police cruiser when five black males walked out of the club at a "brisk pace" while the music was still playing inside the club. Officer Evely became suspicious because the men had left the club before the music ended. The men walked between his police car and Officer Geddies's car. They proceeded to a black Dodge Charger on Queens Chapel Road, about thirty feet from the club. Streetlights illuminated the area. Officer Evely described how the men looked that night, and in court he

identified Messrs. Mobley, Carpenter,[2] and Thompkins as three of the men. He was familiar with and saw Mr. Glover's car near the entrance of the club. Four males got into the black Dodge Charger. They quickly "came out [of the Charger], and started shooting." Officer Evely identified the three defendants as three of the men he saw firing guns.[3] The men fired approximately twenty or twenty-five shots in the direction of the officers. Officer Evely stated that "they [were] firing shots at us." Officer Geddies' car was hit. Officer Evely took cover, and one of the men shot at him. When the shooting stopped, Officers Evely and Bishop pursued the men.

Otis Bartlett, a licensed special police officer employed by the Edgewood apartment complex to provide security, was on duty around 3:00 a.m. on November 24, 2007. He and other security officers were outside and about to begin their patrol around the grounds when Mr. Bartlett heard police sirens. A black Dodge Charger pulled up on the grass between apartment buildings, followed by a police cruiser. "[S]everal male[s] jump[ed] out of the car and

---

[2] At trial, Mr. Carpenter was known as Cornell Swangin.

[3] The parties stipulated at trial that the fourth person was Phil Thompkins, Gerald Thompkins's brother. Officer Evely lost sight of the fifth person who walked out of the club before the music ended.

start[ed] to flee." Three or four people ran in Mr. Bartlett's direction. Mr. Bartlett was unarmed and took cover when he heard shots. He recognized one of the men and made an in-court identification of Mr. Carpenter. He chased the men, and a man with dreadlocks threw a dark object into the brush. When Mr. Bartlett arrived at the 611 Edgewood building, he learned that one man had been apprehended; the man had a shoulder wound and later was identified as Mr. Carpenter. Mr. Bartlett and another special police officer went back to look through the brush and Mr. Bartlett discovered "a black handgun, automatic." He notified an MPD officer.

Around the time of the shooting incident at Club Envy, Detective Anthony Commodore was on duty at the Fifth District police station, a few blocks away. He was about to get into his car "when [he] heard a lot of gunshots." He was dispatched to the Club and then went to the Edgewood apartment complex. He met Officer Evely outside of 611 Edgewood Street, and Officer Evely indicated that one of the perpetrators was inside the building. Detective Commodore saw the alleged perpetrator and made an in-court identification of Mr. Carpenter as the man who had been apprehended.

Upon arriving at the Edgewood complex after following the Dodge Charger, Officer Evely noticed three individuals from the Charger run toward the 611

Edgewood building and one toward the 601 Edgewood building. He identified Mr. Mobley, who had been shot in the ankle, as the person who ran into 601 Edgewood. He also went to 611 Edgewood and identified Mr. Carpenter as one of the men who had fired gunshots at the club. Later, on December 7, 2007, he viewed a photo array and identified Mr. Thompkins as the third perpetrator.[4]

William Sinclair, who had prior criminal convictions and who had a plea agreement with the government regarding a 2007 offense, testified that he and Mr. Carpenter were at the D.C. Jail at the same time. Mr. Carpenter had shared a cell with him for a day when the light in Mr. Carpenter's cell went out. Mr. Carpenter asked if Mr. Sinclair had heard about Mr. Carpenter's case, and Mr. Sinclair said he had not. According to Mr. Sinclair, Mr. Carpenter made the following statement. "[H]e [Mr. Carpenter] went to the club[;] [h]e [saw] someone he was beefing with[,] [s]o some people went to their car to get their guns. [F]irst they w[ere] beefing but they started shooting." "Four" people went outside to get their guns. He [Mr. Carpenter] saw "the person he was beefing with outside. They started shooting." In response to the prosecutor's question, "[t]hey meaning who?

---

[4] On December 14, 2007, MPD Detective Joseph Radvansky showed a photo array to Officer Evely and Officer Evely selected the picture of Phil Thompkins as the fourth perpetrator.

Who started shooting?" Mr. Sinclair replied, "Shay [Mr. Carpenter]." Mr. Carpenter also stated, "[s]omehow they ended up shooting towards the police." When the prosecutor inquired whether Mr. Carpenter said "why they were shooting in the direction of the police," Mr. Sinclair responded, "[t]he guy ran towards them." The "guy" meant "[t]he person they were beefing with." "They started shooting back." Mr. Sinclair assumed that "they" meant "[t]he police." The trial judge instructed him not to assume and Mr. Sinclair remarked, "[h]e [Mr. Carpenter] just said they started shooting back." "They jumped in their cars[] [a]nd . . . they sped off towards the Edgewood neighborhood. The police were chasing him." The car was "[a] black Dodge Charger." When they got to Edgewood, Mr. Carpenter "jumped out the car[,] [t]hrew his gun towards the bushes[, and] ran in a building. He felt as though he was about to pass out. That's when he was arrested."

Sergeant Michael Menefee, a Department of Corrections litigation coordinator, confirmed that Mr. Sinclair and Mr. Carpenter were housed in the same cell from January 10 to January 11, 2008. He also testified about recorded telephone calls made by Mr. Carpenter from the D.C. Jail to Mr. Thompkins

(Gerald). The calls were recorded on a compact disc and admitted into evidence. The jury listened to the recordings during the trial.[5]

After the trial court granted motions for judgment of acquittal regarding counts pertaining to assault on a police officer (Officers Sulla and Bishop), and denied the motions concerning the other charges, Mr. Thompkins presented the testimony of Jermaine Matthews, an investigator with the Alcohol Beverage Regulation Administration who investigated the November 24, 2007, shooting. Mr. Matthews testified that Officer Evely told him that five men walked out of the club to the black Dodge Charger; he heard shots coming from the direction of the car; and he saw "a gentleman in the middle of the street firing at the officers." Mr. Mobley called Officer Sulla as a witness. Officer Sulla indicated that twenty to thirty persons were outside the club at the time of the shooting. He acknowledged that he made a written incident-based report saying that "approximately 12 to 15 shots were fired in the air and at four police officers." Officer Sulla said he "could

---

[5] The prosecutor summarized and discussed the calls between Mr. Carpenter and Mr. Thompkins in which they discussed the shooting at the club, the gun that Mr. Carpenter threw from the car as he and others were fleeing, Mr. Thompkins's unsuccessful efforts later to find the gun, the refusal of a woman on the second floor of an Edgewood apartment to open the door to her apartment, Mr. Carpenter's uncertainty whether "he can beat the[] charges," and Mr. Carpenter's desire to find someone to talk with Mr. Bartlett, one of the Edgewood complex security guards.

not see who specifically was shooting the gun . . . and in what direction the gun was being fired, [or] [i]f it was being fired above the head or at somebody or at a car."

After their convictions, appellants filed motions for a new trial based on post-trial revelations about a juror's admission to prosecutors that he had gone to the scene of the crime before deliberations; the same juror also had a criminal felony conviction that he did not disclose as required. In a May 20, 2009, Memorandum and Order the trial court denied appellants' motions for a new trial. Appellants filed timely appeals from their convictions and from the court's denials of their motions for new trial; appellants requested a remand of the record for a new evidentiary hearing concerning the juror's criminal history. This court remanded the record for further proceedings regarding the alleged bias of the juror, based on the juror's failure to reveal his felony convictions before trial or at the voir dire. The trial court conducted an evidentiary hearing on remand and again denied appellants' motions for a new trial.[6]

---

[6] Only Mr. Mobley and Mr. Thompkins continue to press the contention that the trial court erred by denying their motion for a new trial based on juror bias. After having observed the demeanor of the juror and after listening to his explanation for not initially revealing his criminal record, the trial judge found "that the juror's failure to reveal his felony convictions was not deliberate," and

(continued…)

## ANALYSIS

### *The Severance Motion (Mr. Mobley)*

#### Additional Background

Following the government's opening statement at trial, Mr. Mobley's counsel moved for a mistrial on the ground that "Mr. Mobley is not charged with … obstruction of justice," and "the Government's opening statement to the jury lumped everybody together" and "that is severely and unduly prejudicial against

---

(…continued)

that "[a]lthough the juror acknowledged his . . . criminal convictions, which included felony case numbers, he stated that he had not done any felony time and therefore reasonably believed that he did not have any felony convictions." The court credited the juror's testimony, found that the juror had no "improper reason for wanting to serve as a juror" and "possessed [no] bias against defendants, or in favor of the government." Given this court's deference to the trial court's credibility determination and its factual findings, we see no clear abuse of discretion, and hence, no reason to disturb the trial court's judgment concerning the alleged juror bias issue. *See Ransom v. United States*, 932 A.2d 510, 517 (D.C. 2007) (quoting *Hill v. United States*, 622 A.2d 680, 683-84 (D.C. 1993)) ("Because of the trial court's first hand participation, [f]ollowing a proper hearing, the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion, and the findings of fact underlying that determination are entitled to great deference." (internal quotation marks omitted)).

Mr. Mobley." The trial court denied the motion, asserting that the co-defendants were "appropriately joined together" and that "the jury will be appropriately instructed with regard to the obstruction counts." On the day that Mr. Sinclair was to begin his testimony, Mr. Mobley's counsel renewed his motion for severance because of the obstruction of justice counts against Mr. Carpenter and Mr. Thompkins that counsel claimed prejudiced Mr. Mobley. The trial judge declared, "I don't think there's any compelling prejudice that I would sever," the co-defendants "were appropriately jointly charged," and although "some conduct is admissible against Mr. [Carpenter] and Mr. Thompkins and not [Mr. Mobley] …[,] the court certainly will provide appropriate limiting instructions . . . to minimize any prejudice that would apply to Mr. Mobley." At the end of the day and in the midst of cross-examination of Mr. Sinclair, counsel for Mr. Mobley renewed his motion for severance because of the "link" to Mr. Mobley. The trial judge responded that there was no "necessity for a mistrial and no basis for a severance," and further, that there was independent evidence of participation which the jury could credit. Mr. Mobley's counsel joined the request made by Mr. Thompkins' counsel for a cautionary instruction at the close of Mr. Sinclair's testimony. The judge replied that he had "already done that several times but [that he would] repeat it and in the final charge."

As cross-examination continued on the next trial day, and counsel for Mr. Mobley objected to a question by counsel for Mr. Carpenter, the judge instructed Mr. Sinclair, "[a]gain, only tell us what Mr. [Carpenter] allegedly told you about his own conduct. Just tell us that. Not about anybody else's alleged conduct [] [j]ust his own conduct." The trial court interrupted Mr. Sinclair when he said, "[t]hey went outside to the car, got their guns, and –." The court declared, "He said he got his guns. Don't refer to anybody else." Mr. Sinclair continued by using the pronoun "he" and Mr. Sinclair corrected himself when he used "they," changing it to "he." During the prosecutor's redirect examination of Mr. Sinclair, Mr. Mobley's counsel objected when Mr. Sinclair used the pronoun "they" ("When they w[ere] trying to get away from the police car"). The judge sustained the objection, told Mr. Sinclair not to "refer to anyone else but Mr. [Carpenter]," and instructed the jurors that if they "choose to credit the testimony of this witness" [about Mr. Carpenter's involvement] it "only is admissible against [Mr. Carpenter] with regard [to] . . . his own alleged involvement. It's not admissible against the other defendants."[7]

---

[7] The trial judge repeated the cautionary instruction during final instructions. He stated: "The statement[] allegedly made by [Mr. Carpenter] to [Mr.] Sinclair was admitted only with respect to [Mr. Carpenter], and it was not admitted against defendants Gerald Thompkins and Charles Mobley. You may consider such evidence only with respect to Mr. [Carpenter] and you must not

(continued…)

After the prosecutor completed his redirect examination of Mr. Sinclair, Mr. Mobley's counsel once again moved for mistrial or severance. The trial court denied the motion, saying "I don't see the manifest prejudice that would require a severance or a mistrial." The trial judge further indicated that "there was a brief … use of the term 'they' one time, and I cut him [Mr. Sinclair] off and gave them [the jury] a limiting instruction." The judge added, "they didn't refer to anyone in particular."

### The Parties' Arguments (Mr. Mobley and the United States)

Mr. Mobley challenges the trial court's denial of his severance motion. He contends that "[i]n the absence of appropriate remedial measures or the exclusion of [Mr.] Carpenter's statements altogether, the trial court abused its discretion by denying [the] motion to sever his case from [Mr.] Carpenter," and he further argues that his convictions should be reversed and the case remanded for a new trial because "the error was not harmless." He asserts, in essence, that he was

_____

(…continued)
consider it in any way in your deliberations with respect to defendants Gerald Thompkins and Charles Mobley."

improperly implicated in the shooting because of Mr. Sinclair's use of "they" as he recounted Mr. Carpenter's description of events on the night of the shooting — "[t]hey started shooting," "they [saw] him inside the club," "they went outside the club to [get] their guns," and "they ended up shooting at the police and jumped in their car."

Mr. Mobley maintains that Supreme Court decisions pertaining to the Confrontation Clause[8] "have no . . . impact on the requirements of *Carpenter v. United States*, 430 A.2d 496 (D.C. 1981) (en banc)." That is, he states, "[w]hether or not it is testimonial, a defendant's extrajudicial statement directly implicating a a co-defendant is equally susceptible to improper use by the jury against that codefendant," and hence, "[a] defendant's non-testimonial out-of-court statement … remains a candidate for redaction (or other remedial measures) under Superior Court Criminal Rule of Procedure 14 unless it fits within a hearsay exception rendering it admissible against the non-declarant co-defendant." He also argues that under *Bruton v. United States*, 391 U.S. 123, 137 (1968), "[a] limiting instruction alone is not a sufficient prophylaxis," and either the statement "must be redacted to eliminate all incriminating references to the co-defendant, or the co-

---

[8] *Crawford v. Washington*, 541 U.S. 36 (2004) and *Davis v. Washington*, 547 U.S. 813 (2006).

defendant's motion for severance must be granted."  He claims that the only possible hearsay exception that would be applicable in this case is a statement against penal interest, but that the requirements for admission of Mr. Carpenter's statements (through Mr. Sinclair) under that exception cannot be met.

The government responds that "[t]he trial court did not abuse its discretion in denying [Mr.] Mobley's severance motion," and that Mr. "Carpenter did not make his 'they' statements in circumstances which might have communicated an identification of [Mr.] Mobley" because Mr. "Carpenter made his statements to [Mr.] Sinclair when the two of them were alone in a cell, which appellants' jury understood."  The government reiterates and emphasizes that a co-defendant's (here Mr. Carpenter's) statement may be admitted so long as it "'does not incriminate a non-declarant co-defendant *on its face*, either explicitly or by direct and obvious implication,"' citing *Thomas v. United States*, 978 A.2d 1211, 1235 (D.C. 2009) (emphasis in original).  The government notes that Mr. Sinclair's testimony about Mr. Carpenter's statements "did not implicate [Mr.] Mobley and were properly admitted as the statements of a party-opponent."

**Standard of Review and Applicable Legal Principles**

Our analysis is guided by the following standard of review and legal principles. "[T]he trial court's discretionary judgment regarding whether to grant a severance motion is entitled to great deference and 'may be reversed only upon a clear showing of abuse of discretion.'" *Bailey v. United States*, 10 A.3d 637, 642 (D.C. 2010) (quoting *Winestock v. United States*, 429 A.2d 519, 526 (D.C. 1981)). "When two or more defendants are charged with jointly committing a criminal offense, there is a strong presumption that they will be tried together." *Harrison v. United States*, 76 A.3d 826, 833-34 (D.C. 2013) (citation omitted). We adhere to this presumption of proper joinder under Super. Ct. Crim. R. 8 (b) "because joint trials . . . conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." *Carpenter*, s*upra*, 430 A.2d at 502 (citations omitted). "We will reverse a trial court's denial of a motion to sever 'only if [an appellant] shows he suffered manifest prejudice as a result of being tried jointly.'" *Harrison*, *supra*, 76 A.3d at 834 (citing *Hargraves v. United States*, 62 A.3d 107, 115 (D.C. 2013)) (alteration in original) (internal quotation marks omitted).

"A defendant's . . . extrajudicial statement may be inadmissible against a co-defendant under the Confrontation Clause or traditional rules of hearsay"; therefore, when the government seeks to introduce such a statement against its maker in a joint trial before a jury, *Bruton* and *Carpenter* afford protections to the non-declarant co-defendant." *Thomas*, *supra*, 978 A.2d at 1222. "[C]asual remarks to acquaintances in which the speaker . . . confidentially admitted having committed or intending to commit a crime are not testimonial." *Harrison*, *supra*, 76 A.3d at 836 (quoting *Thomas*, *supra*, 978 A.2d at 1227) (alteration in original) (internal quotation marks omitted). Nevertheless, as we noted in *Harrison*, *Bruton* "held that where a 'powerfully incriminating' extrajudicial statement which inculpates both the declarant and a codefendant is admitted against the declarant (who does not testify) but not against his codefendant, a trial court's limiting instructions are an '[in]adequate substitute for [the codefendant's] constitutional right of cross-examination.'" *Harrison*, *supra*, 76 A.3d at 836 n.8 (alteration in original) (quoting *Bruton*, 391 U.S. at 135, 137).

We reiterated in *Carpenter*, *supra*, that "one defendant's out-of-court confession is not admissible against a codefendant [] [u]nder the traditional rules of evidence [because] it constitutes inadmissible hearsay and has no legitimate probative force against the nondeclarant codefendant." 430 A.2d at 500; *see also*

*Bruton*, 391 U.S. at 128 n.3. Generally, however, "a defendant's extrajudicial statement . . . may be admitted in evidence in a joint trial (with an appropriate limiting instruction . . . ) so long as the statement . . . does not incriminate a non-declarant co-defendant *on its face*, either explicitly or by direct and obvious implication." *Thomas*, *supra*, 978 A.2d at 1235 (emphasis in original). Such an extra-judicial statement "is admissible (with the limiting instruction) even though it alludes non-specifically to the declarant's confederates and the non-declarant co-defendant may be linked to it by other, properly admitted evidence of his guilt." *Id.*

**Discussion**

Because there is a strong presumption under Super. Ct. Crim. R. 8 (b) in favor of joinder of defendants charged with jointly committing a criminal offense, the question that confronts us is whether Mr. Carpenter's use of the pronoun "they," and Mr. Sinclair's repetition of "they" in recounting Mr. Carpenter's extrajudicial statement to him, resulted in manifest prejudice to Mr. Mobley because the pronoun "they," on its face, directly and obviously implicated Mr. Mobley in the shooting at Club Envy on November 24, 2007. On this record and

under our standard of review, we discern no manifest prejudice under the circumstances of this case.

In *Thomas* we discussed circumstances under which use of a plural pronoun to describe those involved in a criminal incident would not, on its face, directly or indirectly implicate a co-defendant. We said that in the statement, "We robbed the bank," the plural pronoun "we" "does not identify anyone other than a declarant." However, if the jury "learn[ed] that the declarant made the comment while standing next to the co-defendant, [the jury] could understand that 'we' unambiguously included the co-defendant." 978 A.2d at 1235-36. *Thomas* also referenced our decision in *Plater v. United States*, 745 A.2d 953 (D.C. 2000). There the redacted confession used the "neutral plural pronoun 'we'" to refer to those who allegedly also committed the offense. *Plater* concluded that "under the circumstances, 'we' was indefinite" and "did not identify anyone with particularity other than the declarant." *Thomas*, *supra*, 978 A.2d at 1236-37 (citing *Plater*, *supra*, 745 A.2d at 961). We further stated in *Thomas* that "the use of a non-specific pronoun like 'we' or 'he' is ordinarily acceptable under *Bruton* and *Carpenter*." *Id.* at 1237. In *Thomas* we considered a statement made by co-defendant Thomas to a third person, "we handled that." When the third person testified before the jury, he stated that co-defendant Thomas had stated that "they

handled that," without identify[ing] any other persons to whom the pronoun referred." *Id*. at 1221. This court concluded that there was no trial court error in admitting the statement, "they handled that," because, "[a]s in *Plater*, the use of the plural pronoun identified no one other than the declarant, [Mr.] Thomas," and "nothing in the remark itself or in the circumstances in which it reportedly was made identified" Mr. Thomas's co-defendant. *Id.* at 1237.

Here, Mr. Carpenter's statement was a non-testimonial admission to Mr. Sinclair that included the neutral plural pronoun "they" which, on its face, did not incriminate Mr. Mobley either explicitly or by direct and obvious implication. Mr. Carpenter made his statement to Mr. Sinclair in the isolation of a jail cell where the two men were alone. Mr. Carpenter's statement specifically mentioned no one other than himself. As he recounted Mr. Carpenter's words to him during trial, Mr. Sinclair began with the singular pronoun, "he," meaning Mr. Carpenter — "he went to the club[;] he saw someone he was beefing with." When Mr. Sinclair switched to a plural subject, as used by Mr. Carpenter, he declared, "some people went to their car to get their guns," identifying no one in particular, let alone Mr. Mobley. Mr. Sinclair then began to use the plural pronoun, "they" — "they started shooting." When the prosecutor asked who "they" meant, Mr. Sinclair responded, "Shay," meaning Mr. Carpenter. Mr. Sinclair continued to use the neutral plural

pronoun "they" until the trial judge interrupted to caution him not to assume anything, to confine his testimony to what Mr. Carpenter told Mr. Sinclair about his own behavior, not anyone else's conduct, and to use "he" instead of "they."

The trial judge also gave timely cautionary instructions to the jurors, informing them that Mr. Carpenter's statement was admissible only against Mr. Carpenter, and not against Mr. Mobley or Mr. Thompkins. The judge also admonished the jurors that they "must not consider [Mr. Carpenter's statement] in any way in [their] deliberations with respect to defendants Gerald Thompkins and Charles Mobley." Consequently under *Bruton*, *Carpenter*, and *Thomas*, we discern no manifest prejudice stemming from Mr. Carpenter's use of the neutral plural pronoun "they," as recounted by Mr. Sinclair, and the joinder of Mr. Mobley with Mr. Carpenter for trial. Nor, in light of the trial court's cautionary instructions, do we see any trial error on this record regarding the admission of Mr. Sinclair's testimony. Finally, we conclude that, under the circumstances of this case, the trial court did not abuse its discretion in denying Mr. Mobley's motion for severance.[9]

---

[9] Because of our conclusion, we do not discuss Mr. Mobley's arguments concerning whether Mr. Carpenter's statement constituted a declaration against penal interest. Nor do we address Mr. Mobley's harmless error contention.

*Merger of the ADW Convictions (Mr. Mobley and Mr. Carpenter)*

In their main briefs, Mr. Carpenter and Mr. Mobley contended that their ADW convictions regarding the police officers merge. The government "agree[d] that appellants' ADW convictions relating to Officer(s) Geddies and Evely merge with the APOWA convictions relating to those officers." However, the government disagrees with Mr. Carpenter and Mr. Mobley regarding their other ADW arguments. The government also agrees that "each appellant's seven PFCVs merge into one, because each appellant possessed a 'single weapon during a single violent act,'" citing *Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1990).

Notwithstanding the government's merger concessions, Mr. Carpenter argues in his reply brief that "[his] convictions for ADW against Officer(s) Bishop and Sulla merge with the remaining ADW count as to Mr. Glover because the government failed to present evidence showing that Mr. Carpenter knew those officers were inside their cars when shots were fired." He emphasizes that the trial court dismissed the APOWA counts relating to Officers Bishop and Sulla, and he maintains that "a reasonable factfinder [also] could not conclude that Mr. Carpenter was 'aware of' Officer Bishop's or Officer Sulla's whereabouts"; hence,

these ADW convictions cannot stand." Mr. Mobley does not discuss the merger issues in his reply brief but, based on his concluding statement, appears to maintain his main-brief position that "[t]he two ADW counts as to Officers Bishop and Sulla merge with the remaining ADW count because there was insufficient evidence that Mr. Mobley knew that those officers were present when the shots were fired."

The government asserts that given the cluster of four police cars "within approximately 15 feet of each other, . . . all four officers [were] in the line of fire between appellants' Dodge Charger and . . . Mr. Glover," and the area was illuminated by a streetlight. Furthermore, the government argues, "Officer Evely opined that appellants were shooting in the four officer's direction." Therefore, "the jury could reasonably infer that, when appellants fired a barrage of shots at Mr. Glover standing in front of Club Envy, appellants could see the four police-officer victims."

The following standard of review and legal principles are applicable to the merger issues in this case. "We review issues of merger *de novo*, to determine whether there has been a violation of the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States." *Roy v. United States*, 871 A.2d 498, 510 (D.C. 2005) (quoting *Nixon v. United States*, 730 A.2d 145, 151-52

(D.C. 1999)) (internal quotation marks omitted); *see also James v. United States*, 718 A.2d 1083, 1086-87 (D.C. 1998) ("Our review of merger issues is limited to assuring that the sentencing court does not exceed its legislative mandate by imposing multiple punishments for the same offense.") (internal quotation and citations omitted). "When reviewing for sufficiency of the evidence, we consider the evidence in the light most favorable to the government." *Vines v. United States*, 70 A.3d 1170, 1179 (D.C. 2013). "We draw all inferences in favor of the prosecution, so long as they are supportable under any view of the evidence," and "[t]he evidence at trial need not conclusively establish guilt to sustain a conviction." *Id.* "Rather, it is sufficient that a reasonable juror could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt."[10] *Id.*

---

[10] "To convict on a charge of assault with a dangerous weapon the prosecution must prove each of the elements of assault in addition to proving that the assault was committed with a dangerous weapon." *See Ruffin v. United States*, 642 A.2d 1288, 1295 (D.C. 1994) (citations omitted). "The three elements of assault are: (1) an act on the part of the accused (which need not result in injury); (2) the apparent present ability to injure the victim at the time the act is committed; and (3) the intent to perform the act which constitutes the assault at the time the act is committed." *Id.* (citations omitted). The intent element requires a general intent to perform the act, rather than specific intent. *Id.* (quoting *Smith v. United States*, 593 A.2d 205, 207 (D.C. 1991)). The assailant, therefore, "need not [have] a conscious purpose to inflict injury." *Id.* (citing *Sousa v. United States*, 400 A.2d 1036, 1044 (D.C.), *cert. denied*, 444 U.S. 981 (1979)).

"In general, where the evidence is that the defendant committed a single assaultive act directed at a group of persons, such as by firing a single shot, multiple assault convictions will merge." *Graure v. United States*, 18 A.3d 743, 761 (D.C. 2011). "By contrast, where multiple shots are fired at more than one person, multiple convictions are appropriate." *Id.* at 761-62 (internal quotation marks and citations omitted); *see also Roy*, *supra*, 871 A.2d at 510 ("Where a defendant has reason to know that his or her intended target is not alone and fires multiple shots in their direction, multiple convictions for ADW are permitted.") (citations omitted).

On the record before us, we are not persuaded by Mr. Carpenter's and Mr. Mobley's additional merger contentions relating to two of their ADW convictions (those pertaining to Officers Bishop and Sulla). In light of our standard of review, and the police officers' testimony – that (i) there was illumination from the streetlight; (ii) the black Dodge Charger was located approximately thirty feet from Club Envy; (iii) Mr. Glover's car was near the entrance of the club; (iv) Officers Evely's and Bishop's vehicles were about five feet from the club while Officer Geddies' was about two feet from Officer Evely's car and Officer Sulla's was about ten feet from Officer Evely's car; and (v) the sound of gunshots could be

heard hitting the police vehicles – reasonable jurors in this case could conclude that "the evidence established [Mr. Carpenter's and Mr. Mobley's] guilt beyond a reasonable doubt" with respect to the ADW convictions relating to Officers Bishop and Sulla. *Vines*, *supra*, 70 A.3d at 1179.

Testimony from the government's witnesses at trial established that twenty to thirty shots were fired from the Dodge Charger toward the front of the club from which Mr. Glover exited and where the police vehicles were stationed. Officer Evely testified that the men "were shooting at us." Given this evidence we see no need to place on the government the additional burden of proving that Mr. Carpenter and Mr. Mobley knew that Officers Bishop and Sulla "were inside their cars when shots were fired." In *Gray v. United States*, 585 A.2d 164, 165 (D.C. 1991), the appellant fired "three shots . . . through a screen door in the direction of three children, twenty to thirty feet away." This court noted that "[t]he screen door was made partly of glass, . . . the children were able to see [appellant][,]" and "the jury could reasonably find that [appellant] could likewise see the children when he fired the weapon." *Id.* at n.1. Reasonable jurors in this case could infer that when Mr. Carpenter and Mr. Mobley were shooting at Mr. Glover, Officers Sulla and Bishop could see the shooters or hear the shots, and the jurors could infer that Mr. Carpenter and Mr. Mobley had reason to believe that Mr. Glover was not alone and

that gunshots would endanger Officers Sulla and Bishop whose cars were in the line of fire.

We do not agree that the trial court's dismissal of the APOWA counts concerning Officers Sulla and Bishop mandated dismissal of the ADW counts involving the same officers, as Mr. Carpenter contends. Mr. Carpenter argued in the trial court that the ADW counts involving Officers Sulla and Bishop should have been dismissed when the trial court dismissed the APOWA counts relating to the same officers. However, when the trial judge dismissed the APOWA counts on the ground that he "[did not] think any reasonable fact-finder could conclude that any of the defendants would be aware of where [Officers] Bishop . . . or . . . Sulla may have been during the transaction," the judge also said that these officers "still might be in a zone of danger for purposes of the ADW." We agree, and the trial testimony clearly shows that Officers Bishop and Sulla were in the line of fire with respect to shots fired.[11] Furthermore, both Mr. Carpenter (who had a shoulder

---

[11] Mr. Carpenter notes that "[t]he jury was not instructed on concurrent intent or "zone of danger" in connection with ADW." We do not see the necessity for such a charge for reasonable jurors to conclude on this record that Officers Bishop and Sulla were in the line of fire. The "zone of danger" instruction was not given in connection with the APOWA counts involving Officers Bishop and Sulla. At any rate, in instructing on the intent to kill while armed charge (of which appellants were acquitted), the trial judge defined "zone of danger," saying that it

(continued…)

wound) and Mr. Mobley (who had an ankle wound) were identified as two of the men who fled in the Dodge Charger to the Edgewood apartment complex and who were apprehended at the complex. Thus, multiple ADW convictions are appropriate, and we are satisfied that the evidence was sufficient to convict Mr. Carpenter and Mr. Mobley of ADW relating to Officers Sulla and Bishop. *See Graure*, *supra*, 18 A.3d at 761-62; *Roy*, *supra*, 871 A.2d at 510; *Ruffin*, *supra*, 642 A.2d at 1295.

### *The Felony APOWA Convictions (Mr. Thompkins)*

Mr. Thompkins claims that his two APOWA felony convictions under D.C. Code § 22-405 (c) must be reduced to misdemeanor APOs under § 22-405 (b) because the trial court committed error by omitting from its APOWA instruction the "significant bodily injury" element, which distinguishes the felony from the misdemeanor.[12] In his reply brief he maintains that the trial court's error

---

(…continued)
"exists where, for example, an assailant fires bullets at one person who is in close proximity to another who reasonably feared for his life."

[12] Mr. Thompkins argues that the omission of the "significant bodily injury" element from the jury instructions violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, which hold that the Sixth Amendment requires that "the

(continued…)

constituted a constitutional due process violation. The government states in a footnote that Mr. Thompkins "concedes that he did not object to the APOWA instructions," and the government contends that this failure "dooms his claim." Citing *Neder v. United States*, 527 U.S. 1 (1999), and emphasizing Mr. Thompkins's convictions of "multiple ADWs based on the barrage of bullets Mr. Thompkins (and his confederates) fired in Officers Geddies and Evely's direction," the government also asserts that, "[n]o rational jury could have convicted [Mr.] Thompkins of ADW on those facts without also finding that [Mr.] Thompkins's assaultive actions constituted violent acts which created a grave risk of significant bodily injury."

Although the trial judge in this case instructed the jury, "as a matter of law, that an assault on a police officer while armed is a crime of violence in the District of Columbia," it did not instruct the jury that to return a guilty verdict on the APOWA offenses, it must find as an element of that felony that Mr. Thompkins "cause[d] significant bodily injury to [Officers Geddies and Evely], or commit[ed]

_____

(…continued)
jury must find beyond a reasonable doubt that the government has proven all elements which are necessary for a conviction or which result in a particular sentence for that conviction." *Apprendi*, *supra*, 530 U.S. at 490; *see also Blakely v. Washington*, 542 U.S. 296, 303 (2004).

a violent act that create[d] a grave risk of causing significant bodily injury to the officer[s]." D.C. Code § 22-405 (c). Therefore, the trial court committed error that was obvious and plain because, as *Apprendi* declared, "[u]nder the Due Process Clause of the Fifth Amendment, any fact . . . that increases the maximum penalty for a crime must be . . . submitted to a jury, and proven beyond a reasonable doubt." 530 U.S. at 475; *see also Alleyne v. United States*, 133 S. Ct. 2151, 2156 (2013) (noting that the Sixth Amendment right to an impartial jury trial "in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt."). Based on *Apprendi* and *Alleyne*, the trial court's error also constituted a constitutional error.

The question we now confront is whether the trial court's plain error requires reversal of Mr. Thompkins's APOWA convictions. We conclude that the court's instructional error does not require reversal of Mr. Thompkins's APOWA convictions, nor their reduction to misdemeanor offenses.

"[C]onstitutional errors can be harmless." *Hedgpeth v. Pulido*, 555 U.S. 57, 60 (2008) (citing *Chapman v. California*, 386 U.S. 18, 22 (1967)). Indeed, "'most constitutional errors can be harmless.'" *Neder*, *supra*, 527 U.S. at 8 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991)). The Supreme Court has

distinguished cases which "defy" harmless error review and those that do not, that is cases that "contain a 'defect affecting the framework within which the trial proceeds,'" and those that contain "simply an error in the trial process." *Neder*, *supra*, 527 U.S. at 8. The Court has also described the distinction as that between "structural errors" and "trial errors." *Fulminante*, *supra*, 499 U.S. at 307-08. *Neder* generally placed instructional error cases of the type here in the constitutional harmless error category; the Court declared, "[u]nlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." 527 U.S. at 9. This court has concluded that an instructional error does not require treatment as a structural error that renders a trial fundamentally unfair. *See Owens v. United States*, 90 A.3d 1118, 1123 n.7 (D.C. 2014) (quoting *In re Taylor*, 75 A.3d 85, 100 (D.C. 2013)) ("[T]he alleged [instructional] error . . . concerns only one element of one of the charged offenses" and does not fall into the "'limited class of constitutional errors [that] qualify as structural errors'").

Since the trial court's instructional error is not the type that requires automatic reversal because the defendant's trial was fundamentally unfair, we proceed to determine whether Mr. Thompkins has satisfied the plain error standard.

"When a party fails to raise a timely objection to an instruction, we will review that claim of error under the plain error standard." *Owens*, *supra*, 90 A.3d at 1123 (internal quotation marks and citation omitted). "Under [that] standard, [he] must show not only that the error was plain or obvious, but also that the error affected substantial rights and resulted in a clear miscarriage of justice." *Id*. (internal quotation marks and citations omitted); *see also Neder*, *supra*, 527 U.S. at 9 (internal quotation marks and citation omitted) (holding that instructional error that does not "seriously affect the fairness, integrity or public reputation of judicial proceedings" may not require reversal).

Even assuming, without deciding, that Mr. Thompkins can show that the trial court's error "affected his substantial rights" because there is "a reasonable probability that the error had a prejudicial effect on the outcome of his trial," *Green v. United States*, 948 A.2d 554, 560 (D.C. 2008), we are satisfied on this record that he cannot satisfy his burden to show that the error "resulted in a clear miscarriage of justice," or that it seriously affected the fairness, integrity, or public reputation of his trial. The government introduced compelling evidence that Mr. Thompkins was one of the men who fired twenty or thirty shots in the direction of Officers Geddies and Evely. Officer Geddies testified that when he exited his police vehicle, he saw someone shooting at him, Officer Evely was "pinned down"

behind his vehicle, and he (Officer Geddies) heard gunshots hitting his car as well as those around him. Officer Evely identified Mr. Thompkins as one of the men shooting at the officers. Based on this compelling evidence, the jury's finding that Mr. Thompkins was guilty of multiple ADW offenses, and the trial court's instruction that "[a] weapon is dangerous if it is used in a manner likely to produce death or great bodily injury," we are satisfied that rational jurors would find that twenty or thirty shots fired in the direction of the officers constituted a "violent act that create[d] a grave risk of causing significant bodily injury" to Officers Geddies and Evely, that is, "an injury that [would] require hospitalization or immediate medical attention." *Fadero v. United States*, 59 A.3d 1239, 1251 (D.C. 2013); *see also Neder*, *supra*, 527 U.S. at 9. In short, Mr. Thompkins cannot show that the trial court's instructional error resulted in a miscarriage of justice, or seriously affected the fairness, integrity, or public reputation of his trial. *See Owens*, *supra*, 90 A.3d at 1124. Consequently, we cannot agree that his felony APWOA convictions should be reduced to misdemeanors.

*Attempted Tampering Conviction (Mr. Thompkins)*

Mr. Thompkins also argues that his obstruction of justice and attempted tampering convictions must be vacated.[13]  We affirm his attempted tampering conviction, pursuant to D.C. Code §§ 22-723 (a) and -1803.  The record indicates that in December 2007 while he was detained at the D.C. Jail following his arrest, the Jail recorded telephone conversations between Mr. Carpenter and Mr. Thompkins.  Mr. Carpenter discussed the gun he threw from the Dodge Charger, describing in detail the place where he had thrown it.  Mr. Thompkins told Mr. Carpenter that he had already searched for the gun in the place described by Mr. Carpenter ("already checked that"), but he could not locate the gun.  Later, in early January 2008 (according to the testimony of government witness Bartlett), Mr. Thompkins went to the Edgewood apartment complex and asked Mr. Bartlett, the

---

[13]  The government agrees that Mr. Thompkins's obstruction of justice conviction, as well as that of Mr. Carpenter, must be reversed under *Wynn v. United States*, 48 A.3d 181 (D.C. 2012), because the "any official proceeding" requirement was not met.  *Id*. at 184 (explaining that under D.C. Code § 22-722 (a)(6) the government must prove beyond a reasonable doubt that a defendant "obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding").  We also agree that the obstruction of justice convictions must be reversed under *Wynn*.

security guard at Edgewood who saw a gun being thrown from the Dodge Charger on the night of the shooting and who recovered it, whether he had seen "somebody throw a gun?" When Mr. Bartlett did not respond, Mr. Thompkins angrily told him, "You didn't see nobody throw a gun. Don't show up to court."

Mr. Thompkins first contends, in essence, that the government failed to satisfy the corroboration requirement of *Opper v. United States*, 348 U.S. 84, 92, 93 (1954) ("[A]dmissions of incriminating facts . . . call for corroboration"; "it is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement," but "[i]t is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth"); *see also In re J.H.*, 928 A.2d 643, 651 (D.C. 2007) (internal quotation marks and citation omitted) ("[C]orroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that defendant is guilty."). As the government points out, in his main brief Mr. Thompkins invokes a pre-*Opper* decision from the District of Columbia Circuit, *Forte v. United States*, 94 F.2d 236, 240 (D.C. Cir. 1937), which required that corroboration consist of "substantial evidence of the

*corpus delicti* and the whole thereof." The Court specifically said in *Opper*, however, that "the corroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti*." 348 U.S. at 93. Rather, the focus is now on "substantial independent evidence which would tend to establish the trustworthiness of the statement." *Id.* *In re J.H.*, *supra*, declared that "the government can use circumstantial evidence to corroborate a confession, and the amount and kind of evidence needed to corroborate a confession will depend upon the facts of each case." 928 A.2d at 652 (citations omitted).

The record shows that the government introduced substantial evidence, independent of Mr. Thompkins's admission about his knowledge of the gun thrown from the Dodge Charger, the location where it was thrown, and his attempt to find the gun. This evidence included Mr. Bartlett's compelling testimony that Mr. Thompkins confronted him in December 2007, asking Mr. Bartlett if he had seen anyone throw a gun, and angrily telling Mr. Bartlett, "You didn't see nobody throw a gun"; "Don't show up to court," evidence from which reasonable jurors could conclude that Mr. Thompkins wanted to find the gun to conceal it from law enforcement authorities. In addition, Sergeant Menefee's testimony confirmed the telephone calls between Mr. Carpenter and Mr. Thompkins, and Officer Evely's testimony not only identified Mr. Thompkins as one of the men by the Dodge

Charger who fired in the direction of the officers, but also confirmed the police chase of the Dodge Charger to the Edgewood apartment complex and the tossing of a gun from the Charger. We conclude that the government met its corroboration burden under *Opper* and *J.H.*

Second, Mr. Thompkins argues in his reply brief "that whatever the [c]ourt's conclusion on the trustworthiness of [Mr. Thompkins's] alleged statement, the evidence is still insufficient under the law of attempt, which requires more than occurred here." Specifically, he claims that the government's proof failed to satisfy the requirement that Mr. Thompkins's "act (reasonably adapted to accomplishing the crime of tampering with physical evidence) must come dangerously close to completing the crime," as the trial judge instructed. Mr. Thompkins maintains that "[e]ven if he got very close to finding the gun, that would not suffice to support an attempted tampering charge because looking is not touching, moving, hiding or otherwise trying to dispose of evidence."

This court recently opined on the "dangerous proximity of completing a crime" test, or as the trial court stated here, the "dangerously close to completing the crime" test. We said, "[t]he test of 'dangerous proximity' of completing a crime is met where, 'except for some interference,' a defendant's overt acts 'would

have resulted in commission of the completed crime,' or where the defendant has taken a 'substantial step toward commission of the crime.'" *Hailstock v. United States*, 85 A.3d 1277, 1282-83 (D.C. 2014) (internal quotation marks omitted) (quoting *Evans v. United States*, 779 A.2d 891, 894 (D.C. 2001)); *see also In re Johnson*, 48 A.3d 170, 173 n.8 (D.C. 2012).  The evidence in this case shows that both tests are met.  Based on the government's evidence, jurors were aware that at the time Mr. Thompkins searched for the gun, he knew that Mr. Carpenter had been arrested and was involved in an official (criminal) proceeding.  Furthermore, reasonable jurors could infer that Mr. Thompkins took a substantial step in completing the crime of tampering by going to the spot where Mr. Carpenter tossed a gun and searching for it, with the intent to prevent it from being used by law enforcement officials in the prosecution of Mr. Carpenter.  This is evidenced by Mr. Thompkins's confrontation with Mr. Bartlett, whom he knew or believed would be a witness against Mr. Carpenter, in early January 2008.  Moreover, reasonable jurors could infer that except for Mr. Bartlett finding a gun, Mr. Thompkins's act of searching for it in the spot where it was thrown would have been successful and he intended to prevent law enforcement authorities from finding the gun and using it in the prosecution of Mr. Carpenter, again as evidenced by Mr. Thompkins's confrontation of Mr. Bartlett to preclude his testimony as a government witness.  Thus, the government's evidence was

sufficient beyond a reasonable doubt to convict Mr. Thompkins of attempted tampering.[14]

## *Conclusion*

In sum, (1) we conclude that the trial court did not abuse its discretion by denying Mr. Mobley's motion for severance; (2) on the merger issues, we hold that appellants' ADW convictions pertaining to Officers Geddies and Evely merge with the APOWA convictions relating to those officers, and that the seven PFCV convictions of each appellant merge into one, but we reject the other merger

---

[14] Mr. Thompkins challenges his CPWL conviction on the ground that the trial court's admission of the Certificate of No Record ("CNR") violated his Confrontation Clause right because he did not have the opportunity to cross-examine the person who prepared the CNR. He acknowledges that because he did not raise a timely objection in the trial court, our review is for plain error. We agree that Mr. Thompkins has sustained his burden to show that the trial court committed error and that the error was plain or obvious at the time of his trial. *See Tabaka v. District of Columbia*, 976 A.2d 173, 175-76 (D.C. 2009) (holding that the trial court violated the Confrontation Clause by admitting a CNR "without corresponding testimony by the DMV official who had performed the search"). However, even if Mr. Thompkins could show that the plain error affected his substantial rights, "he cannot establish that the error seriously affects the fairness, integrity or public reputation of [his] judicial proceeding[]"; we see no evidence that he was denied an opportunity to subpoena and cross-examine the preparer of the CNR, or that his trial "would have been affected had he been provided the opportunity to cross-examine [the preparer]." *Little v. United States*, 989 A.2d 1096, 1105 n.13 (D.C. 2010); *see also Thomas v. United States*, 914 A.2d 1, 22 (D.C. 2006).

arguments advanced by Mr. Mobley and Mr. Carpenter; (3) we are not persuaded by Mr. Thompkins's argument that his two APOWA felony convictions must be reduced to misdemeanors; (4) we vacate Mr. Thompkins's and Mr. Carpenter's obstruction of justice convictions; (5) we affirm Mr. Thompkins's attempted tampering conviction; (6) we affirm Mr. Thompkins's CPWL conviction; and (7) we affirm the trial court's remand decision denying appellants' new trial motion based on juror misconduct.

Accordingly, for the foregoing reasons, we affirm the trial court's judgment in part, reverse it in part, and remand the case to the trial court for resentencing.

*So ordered.*